[No. 15779–5–I.   Division One.   December 31, 1986.]

THE STATE OF WASHINGTON, *Respondent*, v. KERMIT A. BELGARDE, *Appellant*.

*Kermit A. Belgarde,* pro se, and *Mark W. Muenster* of *Washington Appellate Defender Association,* for appellant.

*C. Thomas Moser, Prosecuting Attorney,* and *John W. Murphy* (of *Welts & Welts*), *Special Deputy,* for respondent.

WEBSTER, J.—Kermit A. Belgarde, also known as Gary Thorsen, appeals from his convictions of first degree murder and attempted first degree murder. Belgarde contends that the trial court erred by (1) denying his motion for a mistrial based on prosecutorial references to post–arrest silence, (2) denying his motion for a change of venue, and (3) denying his motion for sequestration of the jury. He also contends that prosecutorial conduct during closing arguments deprived him of a fair trial. We find that Belgarde received a fair trial, and therefore affirm his conviction.

## FACTS

On the evening of March 22, 1984, Kermit Belgarde, Joe Williams, and Williams' seventh–grade nephew Sam visited the home of James Pape and Pape's girl friend, Joanne Nunn. The home is located in Hamilton, Skagit County. Sam was not a welcome visitor in Pape and Nunn's home and upon entering they ordered him to leave. Sam left to wait outside, but his departure led to an argument among

the four adults. The argument ended when Pape and Nunn were each shot. Nunn died instantly; Pape survived. Pape and Williams testified that Belgarde did the shooting. Belgarde, on the other hand, testified that Williams shot the couple. Young Sam claimed he saw Belgarde leave the house, get a rifle, and then reenter the house. Sam testified that he heard two shots and saw his uncle and Belgarde, still holding the rifle, reemerge from the house. Belgarde told Sam to say nothing to the police.

Five witnesses testified that on the evening of the altercation, Belgarde told them that he had shot a couple of people. Three of the witnesses talked with police the next day; the other two, Jane and John Doe,[1] did not tell police about the confession until April 9. The latter two testified that they waited to report the confession because of fear of Belgarde's threats to use AIM (American Indian Movement). One of them claimed that Belgarde was talking about "how they [AIM] get revenge on people that tell and snitch." At trial, Belgarde admitted that he was a member of AIM.

Police apprehended Belgarde in Whatcom County on March 24. Ron Panzero, chief deputy of the Skagit County Sheriff's Department, spoke with Belgarde after the capture. Panzero testified that Belgarde gave him the following alibi: Belgarde had been in Whatcom County looking for a job on the day of the shooting. He knew Joe Williams, but had not seen him for a few weeks. He knew neither Pape nor Nunn, and had not shot them.

The description of events Belgarde gave at trial differed markedly from the one given to Panzero. At trial, Belgarde admitted meeting Pape a month before the shooting. He described being at Nunn and Pape's house on March 22 and watching as Williams fired a rifle twice. At that time, Belgarde knew Pape had been shot, but did not know that Nunn had also been shot. He admitted speaking with the witnesses who claimed to have heard his confessions on the

---

[1]For purposes of this opinion, these witnesses' names have been changed.

night of the incident, but at trial attempted to show they were lying to protect Joe Williams. Each witness was in some manner related to Williams: Claiming to have heard confessions were Williams' niece and her husband; Williams' nephew; and Williams' sister and her husband.

Ultimately, Belgarde was convicted as charged. By special verdicts, the jury found that Belgarde was armed with a deadly weapon (a firearm) at the time he committed the crimes. This appeal timely followed.

### POST–ARREST SILENCE

In his closing arguments, the prosecutor pointed out that Belgarde said nothing to the officers who arrested him about seeing the shooting or being "framed":

> Schmidt—doesn't say anything to Schmidt. Christiensen, the border patrol, doesn't say anything to him. Barriball, again doesn't talk to him except to ask what jail he is going to. This guy who was getting framed, don't you think—I would go, "But wait, I got to tell you guys something." He doesn't say anything. He's getting his chance but wait—Stokes in the area, Huntoon in the area, Kurhenrewther in the area, no talking.

(Persons referred to are the arresting officers.) In rebuttal, the prosecutor again mentioned that Belgarde did not try to tell police that he had seen Williams shoot Pape and Nunn:

> [T]hey get a doctor here who heard the story some three weeks ago. If you got a story and you are innocent, you tell the cops. You don't tell some doctor.

Defense counsel did not object to the prosecutor's remarks during argument, but at the end of trial moved for a mistrial on the basis of these comments. The court denied the motion. On appeal, Belgarde contends the prosecutor's arguments penalized his right to remain silent.

An unequivocal post–arrest post–*Miranda* exercise of the right to remain silent may not be used to impeach a defendant's testimony at trial. *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). Because "every post–arrest silence is insolubly ambiguous", calling attention to a

person's silence after arrest violates due process. *Doyle,* 426 U.S. at 617–18. However, *Doyle* does not apply to prosecutorial inquiry into inconsistent post–*Miranda* statements. *Anderson v. Charles,* 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180, *rehearing denied,* 448 U.S. 912 (1980). A defendant who makes post–*Miranda* statements has not remained silent as to the subject matter of the statements. *Anderson v. Charles, supra.* The prosecutor may therefore seek to elicit an explanation for a prior inconsistent statement, though he may not ask the jury to draw meaning from mere silence. *Anderson v. Charles, supra.* Likewise, in the context of pointing out the contradictions between post–arrest and trial statements, the prosecutor may show or comment upon the defendant's failure to relate to police crucial exculpatory statements recited by the defendant at trial. *Anderson v. Charles, supra; State v. Seeley,* 43 Wn. App. 711, 719 P.2d 168 (1986); *State v. Cosden,* 18 Wn. App. 213, 568 P.2d 802 (1977), *review denied,* 89 Wn.2d 1016, *cert. denied,* 439 U.S. 823 (1978).

In *State v. Cosden, supra,* this court concluded that prosecutorial comment on post–*Miranda* silence is permissible when defendant's defense–related statement to police is "wholly inconsistent with the [defense] interposed at trial", *Cosden,* at 220. The defendant in *Cosden* was arrested on rape charges. After *Miranda* warnings, he told police he had not been with any women on the night in question, and then exercised his right to remain silent. At trial, however, he admitted being with the complaining witness, but claimed the defense of seduction and psychological impotence. At trial, the prosecutor examined a deputy sheriff concerning defendant's silence and commented on defendant's silence in closing argument. This court held both the questioning and closing comments to be proper:

> [T]he fact of his failing to relate the defense of seduction and psychological impotence to the police is not insolubly ambiguous where he later asserts that defense at trial. Under those circumstances his partial silence strongly

suggests a fabricated defense and the silence properly impeaches the later defense.

*Cosden,* at 220–21.

Belgarde contends that the prosecutor's argument was not directed at any inconsistency, but at Belgarde's failure to make an immediate statement. *See People v. Adams,* 102 Ill. App. 3d 1129, 430 N.E.2d 267 (1981) (prosecutor's suggestion to jury that if defendant were innocent she would have informed the officers *immediately* after her arrest held improper). In support of his argument, Belgarde cites a pre–*Anderson v. Charles* case—*State v. Fricks,* 91 Wn.2d 391, 588 P.2d 1328 (1979)—as controlling. In *Fricks,* the defendant was silent on arrest, but later signed a written confession. The next day he repudiated the confession, saying he had signed it to remove suspicion from a friend. The Supreme Court held the prosecutor's implication that defendant's silence was consistent with guilt but inconsistent with the exculpating story given at trial to be improper.

■ Belgarde's reliance on *Fricks* is tenuous. The *Fricks* defendant did not give two inconsistent exculpatory statements; he initially confessed to the crime. Where inconsistent exculpating stories are given, partial silence and failure to incorporate the defense set forth at trial into the initial statement are indicative of recent fabrication. Mention of those factors, therefore, does not violate due process. *Anderson v. Charles, supra; State v. Seeley, supra; State v. Cosden, supra.*

The portions of the prosecutor's closing arguments cited by Belgarde are proper under *Cosden.* They do not point out that Belgarde waited any appreciable length of time after arrest before asserting his alibi. Rather, they point out that, given the statements he made at trial, Belgarde's partial silence at the time of arrest indicates a recently fabricated defense.

PROSECUTORIAL REFERENCES TO "AIM"

■ Witnesses who claimed to have heard Belgarde's

confession testified that they were afraid to go to police with their information because of Belgarde's threat to use AIM. The prosecutor, in both closing and rebuttal arguments, discussed AIM in the context of their fears:

AIM—I didn't want to come in because of AIM—he said he was strong in it. They get even with people. She was scared of what he might do or what his friends might do. . . . What is AIM? Sean Finn is the political wing of the Irish Republican Army. AIM is to the English what the Sean Finn is to the Irish. It is a deadly group of madmen. I'm not saying all of them but that's the way they think of it. Kadafi—feared throughout the world. Why? We don't trust his stability. We don't think [Jane Doe], all four foot three of her, and [John Doe], who is a lot bigger, wanted to spend the rest of their lives looking over their shoulders. Nobody deserves to have to go through that. We don't in our homes. They don't up on the reservation. In the proceedings Mr. Bisagna [defense counsel] says, "Well, I'm an Indian. I'm not afraid of AIM." Well, that's fine. Mr. Bisagna doesn't have an occupation of picking up cans. Mr. Bisagna doesn't live on the reservation. Mr. Bisagna isn't about four foot three inches tall. She was frightened.

. . .

. . . AIM—the people are frightened of AIM. . . . I remember Wounded Knee, South Dakota. Do any of you? It is one of the most chilling events of the last decade. You might talk that over once you get in there. That was the American Indian Movement. That was a faction of the American Indians that were militant, that were butchers, that killed indiscriminately Whites and their own. That event didn't end for some six years before all the court battles were done. Is AIM something to be frightened of when you are an Indian and you live on the reservation? Yes, it is. How do people act when they are scared? You guys decide that for yourselves.

Belgarde did not object, move for a mistrial, or request a curative instruction on the basis of the prosecutor's statements. Review is therefore precluded unless the comments constitute prosecutorial misconduct so flagrant and ill intentioned that no curative instruction could have remedied the error. *State v. Charlton,* 90 Wn.2d 657, 585 P.2d

142 (1978); *State v. Claflin,* 38 Wn. App. 847, 690 P.2d 1186 (1984), *review denied,* 103 Wn.2d 1014 (1985).

Belgarde characterizes the prosecutor's comments as an appeal to jury prejudice. He argues that the comparison of AIM to terrorists in other countries increased the possibility that the jury would decide the case based on Belgarde's associations rather than on the evidence presented.

In closing arguments, counsel are allowed to draw and express reasonable inferences from the evidence produced at trial. *State v. Hale,* 26 Wn. App. 211, 611 P.2d 1370 (1980), *review denied,* 95 Wn.2d 1030 (1981). *See also* RPC 3.4(e), (f). Mere appeals to jury passion and prejudice, as well as prejudicial allusions to matters outside the evidence, are inappropriate. *State v. Claflin, supra.* Likewise, due process prohibits references to a person's race that are intended only to disparage either the person or his race. *State v. Torres,* 16 Wn. App. 254, 554 P.2d 1069 (1976).

In this case, the fear that Belgarde might have created through threats to use AIM bears on witness credibility. Belgarde attempted to impeach two witnesses who claimed to have heard his confession by pointing out the length of time it took them to bring their stories to police. Those witnesses, both of whom are Indians, testified they were afraid to come forward with crucial evidence because they feared AIM. At trial when asked why she feared reporting Belgarde's confession, one witness replied: "When you hear—when you are an Indian and you hear about AIM and I don't know what they'll do to you." Her answer implies that Indians are more knowledgeable about AIM and, in turn, more threatened by the group.

The prosecutor's remarks expand upon the nature of the fear associated with AIM in the minds of Indians who live on the reservation. In his closing arguments relating to AIM, he made no mention of the defendant. He made no references to his own personal belief concerning witness credibility or Belgarde's guilt or innocence. He does, however, greatly elaborate upon the nature of AIM. Belgarde described it as a group organized to protect Indian rights;

the witnesses implied it was a group only to be feared. The prosecutor based his assertion that AIM included indiscriminate killers on his own memory of the events at Wounded Knee.

While the prosecutor's remarks may go beyond the bounds of acceptable closing argument advocacy, they do not appear so flagrant that they could not have been corrected by a curative instruction. The fear potentially instilled by mention of AIM is of importance in this case. Counsel appropriately drew inferences from that fear. His embellishments could have been corrected by proper admonitions from the bench. Moreover, the jury was instructed to disregard those portions of counsel's arguments that were not supported by evidence. That instruction was presumably followed. *See State v. Hale, supra.* The issue of the prosecutor's remarks, therefore, is not appropriately raised on appeal.

### CHANGE OF VENUE

Belgarde contends that pretrial publicity of his case prejudiced his right to an impartial jury. Accordingly, he assigns error to the trial court's denial of his motion for a change of venue.

"The trial court's decision regarding a change of venue motion will not be disturbed on appeal 'absent a convincing showing of an abuse of discretion.'" *State v. Laureano,* 101 Wn.2d 745, 756, 682 P.2d 889 (1984) (quoting *State v. Stiltner,* 80 Wn.2d 47, 52, 491 P.2d 1043 (1971)).

A trial court must grant a motion for change of venue where a defendant shows an apparent probability of prejudice to his right to an impartial jury. *Laureano,* at 756. Actual prejudice resulting from pretrial publicity need not be affirmatively shown. *State v. Laureano, supra.* The following factors, first set forth in *State v. Crudup,* 11 Wn. App. 583, 524 P.2d 479, *review denied,* 84 Wn.2d 1012 (1974), should be considered:

(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*State v. Jeffries*, 105 Wn.2d 398, 409, 717 P.2d 722 (1986) (quoting *State v. Rupe*, 101 Wn.2d 664, 675, 683 P.2d 571 (1984)). *See also State v. Haynes*, 16 Wn. App. 778, 559 P.2d 583 (1977) (indicating that courts in largely rural counties should give great consideration to venue changes when considering unusually notorious crimes).

Numerous newspaper articles appeared describing the Pape/Nunn shooting and the ensuing manhunt for Belgarde. Several of the articles mentioned that Belgarde had pleaded guilty in 1964 to second degree murder, in connection with the stabbing deaths of his father and brother. Additionally, the articles mentioned that at the time of his arrest, Belgarde was being sought on a Tacoma warrant for attempted rape. The publicity generated, however, does not indicate a probability of prejudice.

While there was a great deal of publicity, it was largely factual in nature and not over sensationalized. Five months elapsed from the time of the shooting until the trial began. Of the potential jurors questioned, only one could recall that Belgarde had previously served prison time. While several jurors could remember reading or hearing about the facts of the case, only one claimed to have formed an opinion as to Belgarde's guilt. That juror was excused. Further, Belgarde used only four of his peremptory challenges. The record reflects that the trial judge took great care in ensuring that pretrial publicity did not jeopardize Belgarde's

right to a fair trial. Accordingly, Belgarde has not shown an abuse of discretion.

### SEQUESTRATION OF JURY

Belgarde contends that the substantial amount of publicity, both pretrial and during trial, led to a probability of prejudice, and consequently that the court erred in denying his motion for jury sequestration. The State counters that the record demonstrates considerable care, time and caution taken by the trial court in determining whether sequestration was called for.

The trial judge has broad discretion in determining whether the jury should be allowed to separate during the trial. *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407 (1986). Superior Court Criminal Rule 6.7(a) provides:

> During trial and deliberations the jury may be allowed to separate unless good cause is shown, on the record, for sequestration . . .

■ Appellant's assertions should be considered in light of the purpose of jury sequestration: to protect jurors from outside influence, during the course of a trial, which might affect their verdict. *State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied*, 106 S. Ct. 1208 (1986). In this regard, pretrial publicity is irrelevant. *Guloy*, at 428. To show an abuse of discretion under CrR 6.7, the appellant must show that either (1) jurors were exposed to prejudicial publicity during trial, or (2) the publicity during trial was of such a sensational prejudicial nature that mere risk of exposure created a probability of prejudice. *State v. Ng*, 104 Wn.2d 763, 776, 713 P.2d 63 (1985); *State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984).

Belgarde's case was publicized throughout the trial. Defense counsel twice renewed a motion for sequestration in response to newspaper articles that mentioned Belgarde's second degree murder convictions. Both motions were denied. At the close of all the evidence, the judge examined each of the jurors to determine whether any had received outside influence. Three jurors had read or heard

about the case; one of the three had heard from his father about the murder convictions. The latter juror was removed. Of the other two, one had seen a newspaper courtroom picture, and the other had briefly overheard comments. The record reflects that the trial judge, through instructions and inquiry, carefully guarded against a jury tainted by outside influence. Belgarde has not shown any probability of prejudice.

## CONTENTIONS RAISED IN PRO SE BRIEF

■ We have carefully considered the pro se brief submitted by Belgarde and have determined that it raises no arguments entitling him to relief. In his brief, Belgarde makes several bald assertions unsupported by evidence in the record. Contentions involving matters outside the record, however, cannot be reviewed on direct appeal. *State v. King,* 24 Wn. App. 495, 498, 601 P.2d 982 (1979). He also discusses discrimination against Native American Indians. We assume that he is referring, at least in part, to prosecutorial references to AIM. As previously noted, counsel's failure to object precludes consideration of that issue on appeal.

■ Belgarde goes on to allege ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, one must show *both* (1) that counsel's *performance* was deficient, and (2) that counsel's deficient performance caused *prejudice. Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1983) (test adopted in *State v. Jeffries,* 105 Wn.2d 398, 717 P.2d 722 (1986)), *reh'g denied,* 467 U.S. 1267 (1984). Under *Strickland,* Belgarde's arguments are meritless.

Affirm.

SCHOLFIELD, C.J., and WILLIAMS, J., concur.

Review granted by Supreme Court April 2, 1987.