[No. 17732–0–I.   Division One.   May 11, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. BRETT
A. KENDRICK, *Appellant*.

*Mark Mestel* and *Mestel & Muenster,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *William Downing* and *Rebecca Roe, Deputies,* for respondent.

WEBSTER, J.—Brett Allen Kendrick appeals from the judgment and sentence entered upon a jury verdict finding him guilty of two counts of first degree murder. He raises numerous issues. We find that many of those issues were not preserved for appeal and that those that were preserved

do not warrant reversal of his conviction. Consequently, we affirm.

## FACTS

On the morning of May 30, 1984, the dead bodies of 56–year–old Mary Colleen Gill and her 16–year–old daughter, Katy, were found in the residence the two shared in the Windermere area of Seattle. Colleen's body was completely unclothed; Katy's body had on a sweatshirt that was pushed up around the neck and underpants that had been forcibly removed from one leg. Both women had been beaten about the head, strangled, and stabbed numerous times with a knife. The head of each was mutilated; authorities removed a pocketknife, a screwdriver and knitting needle from Colleen's head, and from Katy's head they removed a screwdriver and a wooden pencil. Katy's body had a kitchen knife protruding from the side and what was later determined to be a human bite mark on the left nipple. There was no evidence of theft, forced entry into the home, or sexual intercourse with either victim.

Police learned through their investigations that Colleen Gill had been in Shay's Cocktail Lounge (Shay's) from the evening of May 29 to the early morning hours of May 30, 1984. A number of lounge patrons recalled seeing Colleen Gill seated next to a young man. That young man was later identified as Brett Kendrick. They recalled that both appeared to be intoxicated, and that Gill had been acting amorously toward Kendrick, though Kendrick was not returning her affections. Colleen left the bar alone at approximately 1 a.m.; within a few minutes, Kendrick left as well. A taxi driver pulled into Shay's parking lot at about the same time. He saw a woman matching Colleen Gill's description standing by the opened passenger side door of a silver gray Mustang in the parking lot. The woman appeared to be waiting for someone.

The Mustang, later determined to be Colleen's, was next seen parked in the vicinity of Shay's at 7:45 a.m. on May 30. In the car were gloves bearing blood that matched Katy Gill's. On both the gloves and the car's driver's seat were

fibers that were microscopically indistinguishable from the fibers contained in green Shay's T-shirts. Some of the patrons who had seen Kendrick in Shay's the night before testified that he had been wearing a green Shay's T-shirt.

Kendrick admitted owning a green Shay's T-shirt. Police, however, were unable to find it. Nor were they able to find a pair of tennis shoes owned by Kendrick at the time of the murder. Kendrick admitted owning a pair of Jox tennis shoes, between sizes 8 and 9. A bloody footprint left at the crime scene was made by a Jox shoe, size 8½. At trial, the defense produced a pair of size 9 Jox tennis shoes that it alleged had been found in a truck which Kendrick had driven. The shoes had a great deal of tar on them, but no traces of blood. Those shoes, it was later revealed, were of a type not sold prior to the time of the killings.

State forensic experts testified that hairs found near Katy Gill's body were consistent with Kendrick's hairs and dissimilar to those of the victims. They also testified that the bite mark on Katy Gill's breast was consistent with the mark that would be left by Kendrick's teeth. In response to their testimony, Kendrick produced experts who opined that the hairs attributed to him could have originated with Katy Gill, and that the bite mark could not have been made by Kendrick. Other evidence used against Kendrick at trial will be discussed in the context of individual issues raised by this appeal.

Kendrick admitted his presence at Shay's, but denied involvement in the murders and presented an alibi defense. He testified as follows: On the night in question, he had consumed approximately 10 scotch-and-waters, as well as cocaine. Because he was intoxicated, he took a nap in his car in a sleeping bag. On awakening he drove to his girl friend's house, arriving there between 3 and 3:59 a.m. Given Kendrick's alibi, the primary issue at trial was his connection with the two homicides.

Following a lengthy trial during which numerous witnesses, both expert and lay, testified, and over 180 exhibits were admitted, the jury returned verdicts of guilty on both

counts charged. The trial court sentenced Kendrick to two life terms, with the sentences to run consecutively. Kendrick's motion for a new trial was denied, and this appeal followed.

As noted, we find that many of the issues Kendrick raises are not properly raised at this late juncture. Our discussion begins with those issues that have been preserved either by counsel's timely objections or by the constitutional implications of the question involved.

### PHOTOGRAPH EVIDENCE

Among the many exhibits introduced at trial were several photographs. Kendrick argues that three of those photographs should not have been admitted because they were unnecessarily gruesome.

■ Accurate, though gruesome, photographic representations are admissible if their probative value outweighs their prejudicial effect. *State v. Crenshaw*, 98 Wn.2d 789, 806, 659 P.2d 488 (1983). The determination of whether a photograph's probative value is outweighed by its prejudicial effect is left to the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. *State v. Crenshaw, supra.* We find no such abuse.

Two of the challenged photographs are of Katy and Colleen Gill as they were found hours after their deaths. Those photographs, like the actions that ended the Gills' lives, were gruesome. They were not, however, *unnecessarily* gruesome. We repeat the oft–quoted proposition that "[a] bloody, brutal crime cannot be explained to a jury in a lily–white manner". *State v. Adams*, 76 Wn.2d 650, 656, 458 P.2d 558 (1969), *rev'd on other grounds*, 403 U.S. 947 (1971).

Furthermore, while the photographs of the victims were gruesome, they were also probative. Kendrick maintained his innocence throughout his trial, thereby placing in issue every element of the crime charged. *See* RCW 10.40.180. These photographs proved the corpus delicti of the crime.

Moreover, they aided the State in explaining its theory of the manner in which the murders were committed. In that regard they were not unlike the challenged photographs that we held were properly admitted in *State v. Bockman,* 37 Wn. App. 474, 682 P.2d 925, *review denied,* 102 Wn.2d 1002 (1984). In *Bockman* we upheld admission of gruesome photographs because they "may have helped the jury understand how the victim was attacked and may have aided the jury in determining what caused the victim's death." 37 Wn. App. at 489. The same factors are of importance here, especially given the lack of eyewitnesses.

Kendrick also challenges the admission of a photograph of his mouth with dental retractors in place to expose the teeth and gums. He describes the pose as "vampire–like". While we question whether the photographs are "grue-some", it is clear that their probative value outweighed any unfair prejudicial impact. The photograph of Kendrick's teeth was offered in connection with the testimony of an odontologist who opined that Kendrick's bite mark was consistent with the bite mark on Katy's breast. The photographs aided the witness in explaining a rather complex theory. Moreover, the jury was told both why the photograph was necessary and why the dental retractors were employed in the taking of the photograph. It was therefore within the court's discretion to admit the challenged photographs.

## TATTOOS

Among the other photographs admitted at trial were two that depicted the rather unique tattoos inscribed on Kendrick's forearms. Both the tattoos are unprofessional renditions, and Kendrick admitted that he volitionally had them placed on his body. One of them depicted a syringe, dripping from the needle end, piercing a skull. The other depicted a woman's head being touched by the head of what was variously described as a peacock or a praying mantis. At trial, defense counsel objected to the introduction of the tattoos on the grounds of irrelevancy and unfair

prejudice. *See* ER 401; ER 403. On appeal, Kendrick renews that challenge. He also raises a First Amendment freedom of expression issue with regard to the tattoos. We first reach the constitutional question.

Kendrick contends that the tattoos are constitutionally protected materials, and as such may not be used as evidence of his guilt. His argument is not well taken. In effect, it is a relevancy objection under the guise of a constitutional argument. It is true that constitutionally protected behavior cannot form the basis of criminal punishment. *See Hess v. Indiana,* 414 U.S. 105, 107, 38 L. Ed. 2d 303, 94 S. Ct. 326 (1973). Consequently, "[t]he State can take no action which will unnecessarily 'chill' or penalize the assertion of a constitutional right and the State may not draw adverse inferences from the exercise of a constitutional right." *State v. Rupe,* 101 Wn.2d 664, 705, 683 P.2d 571 (1984). For instance, neither a defendant's post–arrest silence, *State v. Mace,* 97 Wn.2d 840, 650 P.2d 217 (1982), nor his failure to testify, *Griffin v. California,* 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229, *reh'g denied,* 381 U.S. 957 (1965), may be used as evidence of guilt. The impermissible use of constitutionally protected behavior constitutes a violation of due process. *Zant v. Stephens,* 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983).

In *Rupe,* the trial court allowed the State to introduce evidence concerning the defendant's gun collection during the sentencing proceedings that followed his trial on aggravated first degree murder charges. On appeal, he argued the evidence was irrelevant, prejudicial, and violative of his due process rights. The Supreme Court agreed with him on all three counts. The court found that the challenged evidence directly implicated the defendant's right to bear arms:

> Defendant was thus entitled under our constitution to possess *weapons, without incurring the risk that the* State would subsequently use *the mere fact of possession against him in a criminal trial unrelated to their use.*

(Italics ours.) *State v. Rupe, supra* at 707. Because evi-

dence of firearms possession had no probative value during the sentencing proceedings, the court concluded that its admission violated Rupe's right to bear arms. In essence, the *Rupe* court restated the proposition that constitutionally protected behavior alone cannot form the basis of a criminal punishment. The corollary to that proposition is that if evidence has probative value, its use is not prohibited simply because constitutional provisions are implicated. Consequently, resolution of whether constitutionally protected materials are admissible in a criminal prosecution depends on whether or not such materials are relevant.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. When Kendrick pleaded not guilty, he placed every element of the crime charged in issue. RCW 10.40.180; *State v. Green,* 38 Wn.2d 240, 229 P.2d 318, 23 A.L.R.2d 1397 (1951). Therefore, any evidence tending logically to prove his connection with the Gill murders is deemed material to the State's case. *See State v. Gersvold,* 66 Wn.2d 900, 903, 406 P.2d 318 (1965); *State v. Hults,* 9 Wn. App. 297, 303, 513 P.2d 89 (1973). In determining whether evidence is relevant, the trial court is vested with wide discretion. *See State v. Campbell,* 103 Wn.2d 1, 21, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985). The trial judge's decision should not be disturbed absent clear abuse; that is, where "'no reasonable person would take the view adopted by the trial court.'" *State v. Burgess,* 43 Wn. App. 253, 266, 716 P.2d 948, *review denied,* 106 Wn.2d 1004 (1986) (quoting *State v. Jones,* 26 Wn. App. 551, 553, 614 P.2d 190 (1980)).

Here, we find no abuse of discretion in the admission of the photographs of the tattoos because they are probative of identity. The head of each victim was penetrated with numerous sharp objects. The mutilation was a wholly gratuitous action independent of causing the deaths of the victims. Therefore, there is an indication that the killer had some fascination with sticking objects in heads. Kendrick's

tattoos are probative of such a bent. Consequently, the tattoos were relevant.

Kendrick further argues that any relevancy of the tattoos is outweighed by the danger of unfair prejudice in their admission. Under ER 403, even if evidence is relevant, it may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury". The trial court is vested with broad discretion in administering this rule, and its judgment in the balancing process should be overturned only for manifest abuse. *State v. Coe*, 101 Wn.2d 772, 782, 684 P.2d 668 (1984); *State v. Gatalski*, 40 Wn. App. 601, 610–11, 699 P.2d 804, *review denied*, 104 Wn.2d 1019 (1985).

The sort of factors that should be considered by the trial court exercising discretion under ER 403 include the following:

> the importance of the fact of consequence for which the evidence is offered in the context of the litigation, the strength and length of the chain of inferences necessary to establish the fact of consequence, the availability of alternative means of proof, whether the fact of consequence for which the evidence is offered is being disputed, and, where appropriate, the potential effectiveness of a limiting instruction. . . .

(Footnotes omitted.) M. Graham, *Federal Evidence* § 403.1, at 180–81 (2d ed. 1986).

Reassessing the trial court's decision to admit the tattoo photographs in light of these factors, we find no error under ER 403. Identity was the key issue at Kendrick's trial. The chain of inferences, from the tattoos to identity, was long; the jury was required to determine whether the Gills' killer had some sort of mutilation fascination, whether Kendrick's selection of tattoos displayed a similar fascination, and finally whether Kendrick manifested that fascination at the Gill home. However, any weaknesses in that chain are outweighed by the fact that the State had limited alternative means of proving identity; little physical evidence with

which identity might have been proved was left at the crime scene. It was within the court's discretion, therefore, to admit the tattoo photographs.

## POST–ARREST SILENCE

Kendrick next asserts that his right to due process and his right not to incriminate himself were violated when the prosecutor referred to the fact that he made no statements to police following his arrest. The State counters that Kendrick "opened the door" to questions concerning post–arrest silence when he elicited testimony relating to his cooperation with police. We agree with the State.

On cross examination, defense counsel questioned a police detective concerning the extent of Kendrick's cooperation with the investigation:

Q. In fact [Kendrick] cooperated and did everything that anybody asked of him?

A. As far as I was concerned, yes.

Q. Because I had requested that the police not talk to him, people respected my wishes and didn't ask him where various things might be or might not be; is that right?

A. I didn't and my partner didn't in my presence.

The State then questioned the detective concerning whether he would have liked to question Kendrick. The detective answered affirmatively; the exchange then continued:

Q. Was there ever any statement provided by the Defendant in connection with this case?

A. Never.

MR. MESTEL [Defense Counsel]: Objection, Your Honor.

THE COURT: I'll overrule the objection. The record will stand. Ask another question.

Defense counsel again brought up Kendrick's cooperation with police during its direct examination of Kendrick himself. Kendrick testified that, on hearing of the police's desire to arrest him, he willingly went to the police station and turned himself in. Counsel then elicited the fact that he had instructed Kendrick not to talk with police. To

counsel's question concerning why he was instructed not to talk with police, Kendrick responded as follows:

A. It was because you told me that the police sometimes distort things and also would lie about what future clients or previous clients before that had talked to the police and believed they were lies, what the police interpretated [sic] is what they said.

In its cross examination of Kendrick, the State sought to rebut the impression that he cooperated with police:

Q. Okay. At any rate you decided to go and talk to [defense counsel], who I believe you indicated told you not to tell the cops everything, which was your gut reaction, because they might distort it or lie or that was your understanding of what Mr. Mestel told you, and so that you shouldn't say anything to them? Is that right, is that your testimony?

A. That is correct, yes.

Q. Isn't what Mr. Mestel really told you was not to talk to the police, not to get pinned down, sit back and wait and see what the State could prove and what they couldn't prove and what the evidence would show?

A. No.

Q. And didn't he tell you to sit back as you've done for the last seven months, take a look at the police reports, have conversations, hear all the testimony in court and then give your side of the story?

A. No.

In rebuttal closing arguments, the State once again discussed Kendrick's cooperation:

He now tries to say, you know, that—if he was so willing, so cooperative, wanted to talk, had nothing to hide, if I'm so wrong when I implied in cross–examination of the Defendant that he wanted to sit back and wait for seven months before he said anything, kind of see how things unfolded, see whether his shoes got shown to be a phony or not, you know, where was that statement back then? Well, hadn't had time to think about it yet.

Because "every post–arrest silence is insolubly ambiguous" and does not necessarily tend to show a fabricated defense, calling attention to a person's silence after arrest violates due process of law. *Doyle v. Ohio,* 426 U.S. 610,

617, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). The Washington Supreme Court adopted *Doyle* and extended its holding to prohibit both impeachment and substantive use of post–arrest silence subsequent to *Miranda* warnings. *State v. Fricks,* 91 Wn.2d 391, 588 P.2d 1328 (1979).

However, *Doyle* does not apply where the defendant's post–arrest silence is being introduced to challenge the defendant's evidence of cooperation following arrest. *State v. Vargas,* 25 Wn. App. 809, 610 P.2d 1 (1980). In *Vargas,* the defendant testified that he cooperated fully with the authorities and had given a statement to the police. We found no error in the State's questioning concerning whether the defendant had refused to give any statements at a certain point in time. Our conclusion was that:

> Having brought his cooperation with the police into question, the defendant opened the door to a full development of that subject. The State is allowed to use defendant's postarrest silence to impeach his version of his postarrest conduct.

(Citation omitted.) 25 Wn. App. at 812.

Kendrick, in effect, portrayed his cooperation with police as evidence of his innocence. In so doing, he "opened the door" to further inquiries about the subject. *See State v. Collins,* 45 Wn. App. 541, 726 P.2d 491 (1986). The State, therefore, was properly allowed to rebut that impression by fully developing the extent of Kendrick's cooperation and by exploring the motive behind his actions. We, therefore, find no error.

### THIRD PARTY CONSENT TO WARRANTLESS SEARCH

We next consider Kendrick's argument that the trial court erred in denying his motion to suppress evidence gathered during a warrantless search of premises that he leased. The search was conducted pursuant to consent given by a third party. Kendrick argues that the third party involved, James Blackburn, did not have proper authority to give consent. We find sufficient evidentiary support for

the conclusion that consent was valid.

During its investigation, police learned that Kendrick worked for a roofing company that operated out of a yard and shop on Filbert Road in Snohomish County. Police also learned that Kendrick had a "crash pad" at those premises. A "James Blackburn", claiming to own the roofing company and employ Kendrick, signed a consent form allowing the police to search the yard and shop. Blackburn used his own key to unlock the fence surrounding the premises, and controlled the dogs guarding the area. Inside the shop, police observed roofing materials, personal items belonging to Blackburn, foodstuffs stored by roofing crews, and some items belonging to Kendrick. Police also found growing marijuana.[1]

At the first suppression hearing, Kendrick claimed to have worked for a "Gloria Burke" (Blackburn's "roommate"). Testimony revealed, however, that a Department of Revenue business tax number existed for a business registered to Blackburn, while a second tax number for the same property had been issued to Burke but had been suspended. After hearing the evidence, the court ruled that a preponderance thereof supported the conclusion that Blackburn had authority to give consent to the search. Kendrick now challenges that finding.

The consent of the third party who possesses common authority over premises is valid as against the absent, nonconsenting person with whom that authority is shared. *United States v. Matlock*, 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974). Washington adopted *Matlock*'s standard for finding common authority in *State v. Mathe*, 102 Wn.2d 537, 688 P.2d 859 (1984):

> Common authority is, of course, not to be implied from the mere property interest a third party has in

---

[1]Kendrick was later charged with possession of marijuana. A suppression hearing was held in that cause. Kendrick lost the motion. Prior to his murder trial, Kendrick again moved to suppress evidence gathered during the search of the Filbert Road premises. Again, he lost the motion. The parties agreed to the use of the record of the first suppression hearing for purposes of this appeal.

the property. The authority which justifies the third–party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is *reasonable to recognize that any of the co–inhabitants has the right to permit the inspection* in his own right and that *the others* have assumed the risk that one of their number might permit the common area to be searched.

*Mathe,* at 543 (quoting *United States v. Matlock, supra* at 171 n.7). The court in applying this analysis must consider two factors: First, did the consenting party have the right to permit the search? Second, did the nonconsenting party assume the risk that a co–occupant might permit a search? *Mathe,* at 543–44.

Search warrant requirements exist in order to protect a person's privacy. To the extent Kendrick shared control of the inspected areas with others, his expectations of privacy were reduced. The Snohomish County trial judge deter-mined that several factors indicated Kendrick's intent to share control of the area with Blackburn: Blackburn had control over the guard dogs, stored roofing materials and personal items inside the shop, and had keys to the prem-ises. Further, the testimony indicated that roofing company employees were in and out of the area that Kendrick claimed as his own. The court's formulation of the appro-priate legal standard, as well as its application of the facts thereto, are without error.

### KENDRICK'S COCAINE USE

On direct examination, Kendrick acknowledged that he had been drinking and "doing cocaine" on the night he was at Shay's. According to Kendrick, the cocaine gave him a sense of sobriety. The State explored the question further on cross examination.

Q. Mr. Kendrick, how does cocaine affect you?
A. This instance I assume you are talking about?
Q. This instance or other instances. I assume there are other instances.
MR. MESTEL [Defense Counsel]: Objection to the form of the question. Not relevant about

anything at this time.

Ms. Roe [Prosecutor]: I think it is relevant to his recollection.

The Court: I think it is. There was testimony as to the quick passing effect of the cocaine from Mr. Kendrick, so you may continue.

A. I used it four other times including—

By Ms. Roe:

Q. And you used it on this occasion? And what is its effect on you?

A. It gives you a tingling feeling and makes you talkative.

Q. Would it account for some kind of spaced–out, you know, sort of a blank look that someone might perceive you had?

A. Cocaine, no.

Q. Cause you to lose control completely of what you were thinking about, what you were doing?

A. No.

On appeal, Kendrick argues that this testimony was improperly admitted at trial on two grounds: (1) improper evidence of "other crimes", ER 404(b), and (2) irrelevancy, ER 401. First, we note that Kendrick's relevancy objection is insufficient to preserve appellate review based on ER 404(b). *State v. Fredrick*, 45 Wn. App. 916, 923, 729 P.2d 56 (1986); *State v. Jordan*, 39 Wn. App. 530, 539, 694 P.2d 47 (1985), *cert. denied*, 93 L. Ed. 2d 847 (1987). Therefore, we reach only the ER 401 issue.

The trial court did not abuse its discretion in finding the evidence relevant. Kendrick's testimony regarding Mrs. Gill's interaction with him at Shay's differed markedly from the testimony of patrons who saw him that night. The effect of cocaine on Kendrick is therefore relevant in two respects. First, the combined effects of drugs and alcohol substantially impeached Kendrick's recall of the events in Shay's. Second, it was important to corroborate the patrons' testimony that Kendrick appeared "spaced–out" that night.

### SUBSTANTIATION OF UNFAVORABLE TESTIMONY

The lack of physical evidence at the scene of the crime

came into play in the State's cross examination of Kendrick. The State had introduced evidence that several areas of the Gill home in which one would expect to find fingerprints had been wiped clean. During its cross examination of Kendrick, the State attempted to show that Kendrick was aware of the importance of fingerprint evidence and that he had wiped those areas clean. To that end, the State asked Kendrick about a conversation he had once had with a "Franz Hummel".

Franz Hummel was the victim of an armed robbery of which Kendrick had been convicted in Colorado. The conversation in question had allegedly occurred in the course of that robbery. The State did not, however, mention the fact that the conversation occurred in the course of a robbery. The questioning went as follows:

Q. Now. Mr. Kendrick, you have some understanding of the importance of fingerprints in a case, don't you.
A. Yes.
Q. And you've previously in fact had conversations with people about that?
A. About what?
. . .
Q. And I am specifically alluding, Mr. Kendrick, to a conversation in 1979, February 2, 1979, in Colorado, . . . Mr. Franz Hummel, about the importance of wiping fingerprints. Do you recall the conversation?
A. No, I don't recall the conversation, no.
Q. You don't specifically recall an interchange about wiping fingerprints off an attache case with Mr. Franz Hummel . . .?
A. Yes, I recall the details, but I do not recall the conversation.

■ We first note that defense counsel's objection to the testimony did not specify the particular grounds upon which it was based and, therefore, is insufficient to preserve the question for appellate review. *State v. Guloy,* 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986); *State v. Fredrick, supra.* Presumably, the objection was based on the State's failure to produce Hummel at trial because Kendrick argues on appeal that such

failure was reversible error and that *State v. Martz,* 8 Wn. App. 192, 504 P.2d 1174, *review denied,* 82 Wn.2d 1002 (1973), supports his position.

In *Martz,* the prosecutor, without producing a record of conviction, asked Martz, who was on trial for rape, whether he had ever assaulted a woman while he was in military service. *Martz,* at 195. The court held that the prosecutor's failure to produce the record was not error because Martz had answered affirmatively. However, the court went on to say in dicta that the prosecutor had risked reversible error because in the face of defendant's specific denial of a prior conviction, the State must substantiate its question. *Martz,* at 195–96.

The *Martz* dicta is inapplicable here because Kendrick did not specifically deny the State's questions: In fact, he admitted, "Yes, I recall the details." Assuming, but not deciding that the objection was made on these grounds, we find that the State's failure to produce Hummel is harmless.

### Matters to Which Contemporaneous Objections Were Not Made

■ Counsel's tactical choices may dictate that he remain silent to otherwise objectional testimony. However, the decision to remain silent is not without consequence. By the failure to object at a point that will give the trial judge an opportunity to correct an alleged error, counsel waives the right to predicate an appeal thereon. RAP 2.5(a). *See State v. Jones,* 70 Wn.2d 591, 597, 424 P.2d 665 (1967). Raising the issue in a motion for a new trial does not provide the trial court with the requisite opportunity to correct error. Consequently, counsel may not "remain silent at trial as to claimed errors and later, if the verdict is adverse, urge trial objections for the first time in a motion for new trial or appeal." *State v. Bebb,* 44 Wn. App. 803, 806, 723 P.2d 512 (1986).

Four of Kendrick's assignments of error regard matters to which no timely objection was made. Three of those

assignments relate (1) to the admission of a detective magazine,[2] (2) to a line of questioning concerning a witness's prior representation by defense counsel, and (3) to a line of questioning concerning Kendrick's sexual relations with a named individual on a specific night. Because none of the issues with regard to these matters is of constitutional magnitude, they are deemed waived. *See* RAP 2.5(a). The fourth of those assignments, relating to prosecutorial misconduct, has likewise not been preserved, but warrants further discussion.

## PROSECUTORIAL MISCONDUCT

Kendrick argues that the prosecuting attorney's references to a defense expert witness, Dr. Lowell Levine, constitute prosecutorial misconduct that deprived him of a fair trial. Kendrick casts those references as prosecutorial attempts to disparage Levine and to appeal to jurors' "hometown instincts."

Several times during closing arguments the State referred to Levine's testimony. Several times, those references linked Levine to New York City. The following passage is indicative:

> I said to him, "Dr. Levine, if the members of the jury can't see something that you say is there, they just can't see it themselves, should they believe you simply because you are Lowell Levine from New York City and you say it is so?" Kind of shades of emperor's new clothes, I think, and Dr. Levine's answer was, with his degree of certainty and self-esteem, "Yes, the jury should believe me. So what if they can't see it. They are not trained and experienced like I am," and that displays a certain attitude that I think is lacking from the State's experts who

---

[2]During oral argument, defense counsel informed this court that he objected, in an unrecorded side-bar discussion, to the admission of the magazine. The scope of our review, however, is confined to the record; counsel's failure to produce a record of the court's side-bar ruling precludes our review. *See State v. Koloske*, 100 Wn.2d 889, 896, 676 P.2d 456 (1984). Moreover, the record discloses that, in closing argument, defense counsel stated to the jury, "The State wanted to introduce the cover of the True Detective magazine. *I* offered the entire magazine so you could look at it." (Italics ours.)

want you to be able to see just what it is that the evidence shows in this case, so that you can decide based on your own observations, not on what somebody coming in from New York City with a bill for $20,000 or whatever tells you is there.

■ Defense counsel did not object, move for mistrial, or request a curative instruction on the basis of the now–challenged remarks. Appellate relief is therefore precluded unless the comments constitute prosecutorial misconduct so flagrant and ill intentioned that no curative instruction could have obviated the prejudice they engendered. *State v. Charlton,* 90 Wn.2d 657, 661, 585 P.2d 142 (1978); *State v. Belgarde,* 46 Wn. App. 441, 447, 730 P.2d 746 (1986).

Kendrick likens the statements made to those found to be improper in *State v. Reed,* 102 Wn.2d 140, 684 P.2d 699 (1984). In *Reed,* the prosecutor called the defendant a "liar" several times, stated both that defense counsel did not have a case and that the defendant was clearly a "murder two". *Reed,* at 145–46. Finally, the prosecutor posed the following question to the jury during closing arguments:

> Are you going to let a bunch of city lawyers come down here and make your decision? A bunch of city doctors who drive down here in their Mercedes Benz?

(Italics omitted.) *Reed,* at 143. On review, the court held the prosecutor's comments to be improper because there was a substantial likelihood that these comments had affected the jury's decision. The underlying conviction was therefore reversed. *Reed,* at 147–48.

We find that none of the comments made in Kendrick's case were as flagrant and ill intentioned as those made in *Reed.* The sheer number of times that the prosecutor associated Levine with New York City suggests to us that he was tottering on the brink of improper argument. However, he did not cross the bounds beyond which a curative instruction would have been futile in averting any unfair prejudice to Kendrick. Therefore, appellate review is precluded.

Kendrick also argues that the prosecutor deprived him of

a fair trial by referring to the fact that defense experts were being paid to testify and that the funds for hiring those experts came from the public coffers. Again, the record reveals no objections on these grounds. Moreover, the fact that defense experts testified at public expense was never specifically brought to the jury's attention. Error, if any, could have been corrected, but Kendrick did not seek a correction at trial, and likewise may not do so here.

We affirm the judgment and sentence of the trial court on both counts of first degree murder.

WILLIAMS and PEKELIS, JJ., concur.

Review denied by Supreme Court July 1, 1987.