[No. 23972-4-I. Division One. September 3, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. KERMIT A.
BELGARDE, *Appellant*.

*Robert Gombiner* and *Nance, Iaria & Gombiner,* for appellant.

*Michael Rickert, Prosecuting Attorney,* and *K. Garl Long, Deputy,* for respondent.

PEKELIS, J. — Kermit Belgarde, also known as Gary Thorsen, challenges his convictions for first degree murder and attempted first degree murder, contending that the trial court erred in (1) denying his affidavit for a change of judge, (2) allowing defense counsel to testify at trial without requiring him to withdraw from the case, and (3) admitting the hearsay testimony of a police officer which refuted Belgarde's alibi statements. Belgarde also contends that the trial judge pro tempore lacked jurisdiction to hear the case. We affirm.

I

On the evening of March 22, 1984, Kermit Belgarde, Joe Williams, and Williams' young nephew, Sam Bright, visited the home of James Pape and Joanne Nunn. Bright was asked to and did leave the house, but an argument ensued among the four adults which culminated in the shooting of Pape and Nunn. Nunn died instantly; Pape survived. Belgarde was subsequently arrested, tried, and convicted in 1984 of first degree murder and attempted first degree murder. In 1988, the Supreme Court reversed Belgarde's conviction and remanded for a new trial, hold-

ing that prosecutorial conduct during closing arguments deprived him of a fair trial. *State v. Belgarde*, 110 Wn.2d 504, 755 P.2d 174 (1988), *rev'g State v. Belgarde*, 46 Wn. App. 441, 730 P.2d 746 (1987).

Upon remand to the superior court for retrial, the case was assigned to Judge Walter J. Deierlein, Jr., who had presided over the first trial. On July 8, 1988, Belgarde appeared before the judge with an attorney from the public defender's office and requested the appointment of new counsel. The attorney explained that a conflict existed which prevented his office from representing Belgarde. Prior to withdrawing, however, the attorney filed an affidavit for a change of judge pursuant to RCW 4.12.050. Judge Deierlein denied the affidavit because he had made discretionary rulings in the preceding trial. The attorney replied that he would "prepare a further motion for recusal in this matter for the Court to rule on."

On July 27, 1988, Belgarde appeared again before Judge Deierlein this time represented by new counsel. The judge first briefed the attorney on the procedural history of the case, noting that while Belgarde's affidavit of prejudice had been denied, a motion for recusal could still be filed. The judge then turned to the issue of scheduling a date for trial. When Belgarde requested that trial be set for February or March 1989, the judge commented that he would be retiring on January 8, 1989, and wondered if these dates would be convenient for his successor. However, after further discussion, trial was set for February 6, 1989.

Judge Deierlein retired as planned. Nonetheless, he presided over Belgarde's February retrial. There is no evidence of any written stipulation between the parties agreeing to the appointment of a judge pro tempore nor any objection to having the retired judge continue to hear the case.

Partway through the retrial, a mistrial was declared. After granting a change of venue, Judge Deierlein presided over the second trial, which commenced in

March 1989. Belgarde's defense was that Williams shot the couple. Pape and Williams testified that Belgarde did the shooting. Sam Bright, who was outside, testified that he saw Belgarde come out of the house, get a rifle, and fire two shots from the front steps.

Five witnesses also testified that on the evening of the altercation, Belgarde told them he had shot a couple of people. Three of the witnesses talked with police the next day; the other two did not tell the police about the confession until several weeks later, claiming they were afraid of Belgarde's threat to use AIM (American Indian Movement) against them.

Police apprehended Belgarde in Whatcom County on March 24, 1984. Ron Panzero, chief deputy of the Skagit County Sheriff's Department, spoke with Belgarde after the capture. Panzero testified that Belgarde gave him the following alibi: On the night before the shooting he had been in Bellingham where he spoke with a security guard on the docks about a job. On the next day, Thursday, he had been in Mount Vernon where he talked to Don Hanson. On Friday, he went to Sedro Woolley where he met Carole Whipple. Belgarde also told Panzero that he knew Joe Williams, but had not seen him for at least 3 weeks. He knew neither Pape nor Nunn, and had not shot them.

After speaking with Belgarde, Chief Deputy Panzero asked Detective Chris Andersen to follow up on Belgarde's alibi. As Andersen began to testify about what he found, defense counsel objected to anything Andersen discovered from his conversation with the Whipples on hearsay grounds. The court overruled the objection, but limited Andersen's testimony to whether Belgarde's statements were "supported or not supported, confirmed or denied." Thereafter, Andersen testified that "parts of Belgarde's statements were true about where he had been; however, the times were not the same." He went on to explain that, for example, Belgarde had visited the Whipples on Thursday, not Friday. Andersen also testified without objection

that he was unable to find anyone at the Bellingham security office who had spoken with Belgarde.

Wayne White, chief of police in Concrete, testified that he was contacted at the police station by Joe Williams after the shooting. Williams told White that "Gary had done the shooting." Williams described Gary as a Cuban or Mexican he picked up hitchhiking in Sedro Woolley and that they went to Pape's home where an argument ensued and a shot was fired.

Near the conclusion of trial, defense counsel asked for permission to take the witness stand himself in order to testify that during an interview on February 6, 1989, Williams admitted making up the hitchhiker story so Belgarde would get caught.[1] When the trial court asked Belgarde whether he understood that his attorney's credibility could be attacked on cross examination, Belgarde replied, "Well, I'll agree to let him testify . . . Yes." Accordingly, the court granted the request.

On cross examination, defense counsel admitted that Williams' statement was made after Williams had indicated his fear of Belgarde, that he had expended a great deal of time in preparing for the case and that he was being paid to represent Belgarde.

On March 16, 1989, Belgarde was found guilty by a jury on both charges. He appeals.

## II

Belgarde first contends that the trial court erred in denying his affidavit of prejudice. He argues that because a new trial following a reversal on appeal is a separate case, he was entitled to an affidavit against the original trial judge. The State asserts that, because the affidavit was untimely, it was properly denied.[2]

---

[1] Belgarde is represented by different counsel on appeal.

[2] We note that the State also argues that Belgarde has waived his right to challenge the affidavit of prejudice because the trial court never made a final ruling on the issue and Belgarde subsequently failed to bring the matter to the

Under RCW 4.12.040 and .050, a party has the right to disqualify a trial judge without demonstrating actual prejudice, if the statutory requirements of RCW 4.12.050 are met. *Harbor Enters., Inc. v. Gudjonsson*, 116 Wn.2d 283, 285, 803 P.2d 798 (1991); *Marine Power & Equip. Co. v. Department of Transp.*, 102 Wn.2d 457, 459, 687 P.2d 202 (1984). These requirements include the following:

> *Provided*, That such motion and affidavit is filed and called to the attention of the judge before he shall have made any ruling whatsoever *in the case*, . . . and before the judge presiding has made any order or ruling involving discretion . . ..

(Italics ours.) Former RCW 4.12.050. Here, Belgarde filed his affidavit at his first appearance before the trial court following remand. Consequently, the issue is whether the phrase "in the case" includes rulings made during Belgarde's first trial.

In support of his contention, Belgarde relies on *State v. Sullivan*, 486 S.W.2d 474 (Mo. 1972). In *Sullivan*, the defendant filed his affidavit 23 days prior to the commencement of his third trial, but after the same judge had presided at two previous trials, one of which followed the reversal of his conviction on appeal. The Missouri rule then in effect allowed a party to disqualify a judge upon the filing of an affidavit "not less than five days before the day the *case* has been set for trial". (Italics ours.) *Sullivan*, 486 S.W.2d at 476. On appeal, the court stated that "[t]he rule seems quite clear that, regardless of the number of times the case is tried, the defendant is entitled to one disqualification of the trial judge upon the timely filing of his affidavit of prejudice." *Sullivan*, 486 S.W.2d at 476.

---

court's attention. This assertion, however, has no basis in the record. When Belgarde's attorney filed the affidavit at the July 8, 1988, hearing, the court clearly stated that it had ruled on "innumerable discretionary matters" in the first case and would not step down. There was nothing tentative about the trial judge's ruling that Belgarde was not entitled to exercise his affidavit of prejudice because it was untimely. Whether the court would have granted a later defense motion *asking* the judge to recuse himself is irrelevant.

■ Here, Belgarde urges this court to adopt the reasoning in *Sullivan* and hold that he is entitled to an affidavit against the original trial judge on remand. We decline to do so. First, the overall language of the rule cited in *Sullivan* differs substantially from that of RCW 4.12.050. The wording of the Missouri rule makes it plain that there "case" is being used synonymously with "trial". This does not help us in deciding what our Legislature meant in the wording of our statute. Moreover, we agree with the thoughtful analysis of RCW 4.12.050 contained in a recent decision of this court, *State v. Clemons*, 56 Wn. App. 57, 782 P.2d 219 (1989), *review denied*, 114 Wn.2d 1005 (1990).

In *Clemons*, the court held that a defendant was not entitled to file an affidavit of prejudice against the original trial judge on retrial after a mistrial had been declared. Writing for the panel, Judge Forrest first observed that RCW 4.12.050 uses the more inclusive word "case" rather than "trial". He then reasoned that a retrial was not a "new proceeding" for purposes of RCW 4.12.050 because it did not present "new issues arising out of new facts occurring since the trial." *Clemons*, 56 Wn. App. at 60 (citing *State ex rel. Mauerman v. Superior Court*, 44 Wn.2d 828, 830, 271 P.2d 435 (1954)). The opinion concludes with the following observations:

> Clemons did not choose to file an affidavit when the case was first assigned to the trial judge, presumably because he was satisfied that he would receive a fair trial. The only change of circumstance is that the judge has made discretionary rulings which Clemons presumably now feels to be unfavorable. This is exactly the "judge shopping" that the timeliness requirement [of RCW 4.12.050] is designed to prevent.
>
> A retrial following a mistrial does not constitute double jeopardy. While the policy considerations are somewhat different, this rule supports treating a retrial as "in the case" and not as a "new proceeding." This result is also consistent with the view that a retrial follows a trial which for one reason or another was not completed, with the purpose of completing the unfinished business.

> This interpretation implements the statutory purpose by allowing a party to eliminate a judge in advance to enhance the sense of fairness, but prohibits the elimination of a judge once he has made discretionary rulings . . ..

(Footnote omitted.) *Clemons*, 56 Wn. App. at 61.

We perceive no difference between a retrial after a mistrial and a retrial following a reversal on appeal. The case does not present new issues arising out of new facts occurring since the first trial. After remand the facts remain the same, the parties remain the same, even the cause number remains the same.

Belgarde attempts to distinguish *Clemons* by arguing that a trial judge who has been reversed will have preconceived notions about the new trial's outcome. However, this argument ignores the fact that in *Clemons*, the mistrial occurred at the conclusion of the trial as the result of a hung jury. In such a situation, the trial judge would be just as likely to have "preconceived notions" about the course of the new trial as the trial judge who has been reversed.

In sum, we hold that under RCW 4.12.050, Belgarde's retrial following the reversal of his earlier conviction constitutes a further proceeding in the same case. The court did not err in denying his affidavit for a change of judge.

### III

Belgarde next contends that the judgment entered against him is void, claiming that because he did not consent to the trial judge's appointment as a judge pro tempore, the court was without jurisdiction to hear the case. The State maintains that Belgarde constructively consented to the trial judge's appointment as a judge pro tempore.

In 1984, when Belgarde's first trial began, Const. art. 4, § 7 provided:

> A case in the superior court may be tried by a judge, pro tempore, who must be a member of the bar, agreed upon in writing by the parties litigant, or their attorneys of record, approved by the court and sworn to try the case.

However, in 1987, while Belgarde's appeal was pending before the Supreme Court, Const. art. 4, § 7 was amended by referendum to include the following language:

> f a previously elected judge of the superior court retires leaving a *pending* case in which the judge has made discretionary rulings, the judge is entitled to hear the pending case as a judge pro tempore without any written agreement.

(Italics ours.) RCW 2.08.180, which is virtually identical to the constitutional provision, was also amended to reflect this change effective January 1, 1988.

Belgarde argues that because the 1988 amendment is in derogation of his right to a trial before an elected superior court judge, it should not apply retroactively. For purposes of this assignment of error, Belgarde argues that his "case" commenced in 1984. In light of our analysis on the meaning of "case" in the context of RCW 4.12.050, we are constrained to agree with Belgarde that 1984 is the operative date for purposes of article 4, section 7. Thus, if the constitutional amendment operates prospectively only, it would not apply to Judge Deierlein's retirement here.

As a general rule, unless they are remedial in nature, statutory amendments operate prospectively only. *Seek Sys., Inc. v. Scully-Walton, Inc.*, 55 Wn. App. 318, 320, 777 P.2d 560 (1989). An amendment is remedial when it relates to practice, procedure or remedies and does not affect a substantive or vested right. *In re Mota*, 114 Wn.2d 465, 471, 788 P.2d 538 (1990). Logically, this rule would apply equally to the interpretation of a constitutional amendment.

In *State v. Sain*, 34 Wn. App. 553, 557, 663 P.2d 493 (1983), this court specifically stated that the right "to be tried in a court presided over by an elected superior court judge accountable to the electorate, is a substantial right." It appears the *Sain* court was equating the word "substantial" with "substantive".[3] Thus, applying the statutory

---

[3] We note that the Supreme Court has neither endorsed nor rejected this characterization. However, it is debatable whether a litigant's right to an elected judge is substantive rather than procedural.

rule of construction here, we conclude that the 1987 amendment affected a substantive right of Belgarde's which he had obtained in 1984 when this "case" first arose.

■ However, the inapplicability of the 1987 amendment to Belgarde's case is not dispositive of this appeal. The constitutional amendment did not change the basic premise that a valid appointment of a judge pro tempore can be effected by the consent of the parties. *Burton v. Ascol*, 105 Wn.2d 344, 351, 715 P.2d 110 (1986); *National Bank of Wash. v. McCrillis*, 15 Wn.2d 345, 357, 130 P.2d 901, 144 A.L.R. 1197 (1942); *Mitchell v. Kitsap Cy.*, 59 Wn. App. 177, 181, 797 P.2d 516 (1990); *State v. McNairy*, 20 Wn. App. 438, 440, 580 P.2d 650 (1978). Generally, the parties may consent to the appointment of the judge pro tempore either orally in open court or by written stipulation. *McCrillis*, 15 Wn.2d at 356; *State ex rel. Cougill v. Sachs*, 3 Wash. 691, 29 P. 446 (1892). Without the parties' consent, the judge pro tempore lacks jurisdiction. *Burton v. Ascol, supra.*

It is true that Belgarde never explicitly gave consent for Judge Deierlein to preside over his case. Nonetheless, we believe the circumstances here strongly evidence constructive consent. It is undisputed that Belgarde and his attorney knew of Judge Deierlein's pro tempore status. He specifically informed them well in advance that he would be retiring before the start of retrial. Belgarde proceeded without objection not only through the first mistrial, but through the second trial from which this appeal arises. These facts contrast markedly with *State v. McNairy*, 20 Wn. App. 438, 580 P.2d 650 (1978), cited by Belgarde. There the requisite consent was deemed lacking because the defendant was completely unaware of the trial judge's pro tempore status, believing instead that he was a visiting judge.

Accordingly, we conclude that the trial court had jurisdiction to hear the case. Although the 1987 constitutional amendment and subsequent statutory change do not

apply to this case, our review of the entire record makes it clear that Belgarde affirmatively decided to accept Judge Deierlein as the trial judge.

## IV

Belgarde next contends that the trial court erred in permitting Officer Andersen to testify regarding what he had learned from other persons in his attempt to verify Belgarde's alibi. He argues that the testimony was inadmissible hearsay which the State used to smear him during closing argument.[4]

 We agree with Belgarde that Officer Andersen's testimony concerning what he was told by the persons he contacted is based on hearsay for which there is no exception asserted. Nonetheless, the error is clearly harmless. An error in the admission of evidence is not reversible unless the error materially affected the outcome of the trial. *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). Belgarde's theory at trial was that Williams, not Belgarde, had the motive to shoot the victims because he was annoyed that they had ordered Sam Bright out of their home. Thus, although not explicit, it is obvious that Belgarde never asserted that he was someplace other than Pape and Nunn's home on the night of the shooting. Consequently, the admitted hearsay testimony was not material to the outcome of the case.

## V

 Belgarde's final contention is that the trial court erred in permitting his attorney to testify without first requiring him to withdraw from the case. This assertion is without merit. In response to the trial court's question, Belgarde stated that he agreed to allow his attorney to take the witness stand for the limited purpose of impeach-

---

[4]Belgarde does not assign error to the prosecutor's remarks during closing. His assignment of error is strictly that "[t]he trial court erred in allowing hearsay testimony by Police Officer Chris Andersen concerning Officer Andersen's efforts to verify or disprove post-arrest statements made by appellant."

ing Williams' story about the hitchhiker. Because Belgarde invited the very error to which he is now objecting, we will not consider it on appeal. *State v. Pam,* 101 Wn.2d 507, 511, 680 P.2d 762 (1984).

Accordingly, we affirm Belgarde's convictions.

FORREST and AGID, JJ., concur.

Reconsideration denied November 12, 1991.

Review granted at 118 Wn.2d 1021 (1992).