# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 58245-7-II |
| RONALD R. BARTON, | |
| Petitioner. | UNPUBLISHED OPINION |

GLASGOW, J.—In this timely personal restraint petition (PRP), Ronald Barton seeks relief following his 2021 convictions for three counts of second degree rape of a child. Barton repeatedly raped KMS, his 13-year-old step-granddaughter, over several weeks while KMS stayed at Barton's home in Pacific County. KMS was initially hesitant to report Barton because she believed she was in love with him and she wanted to continue the relationship in secret, but she revealed the rapes after her stepmother saw exchanges of sexual messages and photos between KMS and Barton on KMS's phone. A deputy sheriff also saw the sexual messages and photos.

KMS also reported that Barton consistently gave her methamphetamine, marijuana, and alcohol during the time she stayed with him as a precursor to sexual intercourse. However, Barton has attached new evidence in this PRP regarding a test of KMS's hair that, if true, would show that KMS did not consume methamphetamine during the entire period of the alleged abuse.

Barton argues in this timely PRP that (1) his trial counsel was ineffective in failing to present the relevant new evidence regarding the test of KMS's hair for methamphetamine; (2) his

appellate counsel was ineffective in failing to challenge an indirect comment on his silence; (3) the State failed to disclose that a law enforcement witness was subject to an internal affairs investigation and was on paid administrative leave at the time of his testimony; (4) the noncorroboration provision of Washington's "Rape Shield Statute" is unconstitutional; and (5) several additional arguments in his pro se initiation petition. Barton also argues, and the State concedes, that Barton was improperly restrained at his sentencing proceeding without an individualized inquiry into the need for restraints.

With respect to his ineffective assistance of trial counsel claim, Barton has made a sufficient showing that he received deficient representation because his counsel failed to perform an adequate investigation to obtain more definitive evidence about what time period the test of KMS's hair for methamphetamine would have covered. However, Barton cannot show he was prejudiced by the deficiency because there is not a reasonable probability that the outcome of the trial would have been different if the jury heard that KMS, a child, had not consumed methamphetamine, despite her testimony that she did. KMS's stepmother and a sheriff's deputy described to the jury the exchanges of sexual messages and photographs that they saw between Barton and KMS on KMS's phone. And KMS's testimony about the charged incidents was extremely detailed.

With regard to Barton's remaining arguments, we conclude that Barton did not receive ineffective assistance of appellate counsel, he was not prejudiced by the State's failure to disclose impeachment evidence, and he has failed to show any connection between the challenged provision of the Rape Shield Statute and his current restraint. However, we accept the State's concession that resentencing is required.

Therefore, we grant the petition in part, deny in part, and remand only for resentencing.

FACTS

I. BACKGROUND

Ronald Barton is KMS's step-grandfather. Barton lived in Pacific County with his wife, Sandie, and his mother, Judy. KMS lived in Oregon with her stepmother, CS, who is Barton's biological daughter and Sandie's stepdaughter. CS and Barton "always had a very rocky relationship," including periods of no contact, but they reconciled around 2018. 1 Verbatim Rep. of Proc. (VRP) at 455. CS introduced KMS to Barton when KMS was 10.

KMS stayed with Barton, Sandie, and Judy for several weeks during two consecutive summers, without CS. First, KMS visited during the summer of 2020, when she was 12. Although Barton "wasn't there a lot," at some point that summer Barton began to offer KMS marijuana and alcohol. 1 VRP at 217. KMS enjoyed the visit and asked to return the following summer.

KMS returned in mid-June 2021 when she was 13. KMS was originally scheduled to stay with Barton until July, but stayed until mid-August after asking to extend her trip. CS visited KMS in Pacific County three times and did not notice any changes in KMS's personality or behavior throughout the summer. Barton drove KMS home to Oregon in mid-August. CS noticed that after KMS returned, she was more reserved and "in her own little world." 1 VRP at 455.

CS and KMS then returned to the Pacific County property for a Labor Day barbeque and overnight camping trip with at least 20 attendees, including CS's sister-in-law, Brittany. Shortly after arriving, CS had an argument that turned into a "physical altercation" with Sandie, though their relationship was "fine" before then. 1 VRP at 459; 2 VRP at 522. The argument was unrelated

3

to Barton's conduct, but Barton became involved when he intervened to pull Sandie off of CS. After the altercation, the party continued.

The witnesses dispute what happened next. According to Brittany, Sandie told her she believed KMS and Barton were in a sexual relationship. Brittany then relayed the accusation to CS, who at first thought Brittany was lying "to create more conflict." 2 VRP at 473. Sandie denied making this accusation; she said she told Brittany she was not concerned about their relationship when asked.

CS and KMS left the party, and KMS repeatedly denied any inappropriate contact with Barton. CS reported the allegations to law enforcement but did not pursue the issue further.

Then, about a week later, CS found a locked phone in KMS's purse that she had never seen before. CS confronted KMS, who reluctantly gave her the passcode. On the phone, CS saw nude photos of KMS and sexually explicit Instagram messages between KMS and Barton. CS recognized the user who sent the messages as Barton from her own prior Instagram messages with him. There were no photos of Barton on KMS's phone.

For a few moments, even after CS saw the messages and recognized Barton's profile, KMS still attempted to deny sexual contact with Barton because she "didn't want it to stop" and wanted to prevent their "relationship" from being "destroyed." 1 VRP at 274. She then admitted to CS that Barton had intercourse with her over the summer. CS immediately drove KMS from Oregon to a crisis support center in Pacific County to report Barton to the local authorities. The crisis center staff contacted police.

4

No. 58245-7-II

## II. POLICE INVESTIGATION

Deputy Acdal responded to the crisis support center where KMS told him that Barton had sexual intercourse with her over 20 times between early July and early August 2021 and that Barton gave her alcohol, marijuana, and methamphetamine before intercourse. Deputy Acdal also examined KMS's phone after CS provided the passcode.

In KMS's phone, Deputy Acdal saw nude photos and Instagram messages between KMS and a user that Deputy Acdal believed to be Barton based on the profile picture. Deputy Acdal did not obtain copies of the messages, but he reviewed the messages and transcribed quotes from the messages in his contemporaneous probable cause statement. This included messages where KMS referred to Barton as "'Baby,'" asked, "'What the f*ck is a butt plunge for?'" and said, "'I don't regret any of it.'" Clerk's Papers at 3. Deputy Acdal also quoted messages where Barton asked, "'You getting naked?'" and replied, "'I don't either regret.'" *Id.* Barton also mentioned pictures that KMS sent to him, and KMS responded that she had more pictures for him.

Later that day, Deputy Acdal arrested Barton for rape of a child and seized Barton's phone as evidence. Deputy Acdal obtained a search warrant for an extraction of both phones to be completed by another officer, Deputy Eastham. As we stated in our opinion resolving Barton's direct appeal, Deputy Eastham then forensically examined KMS's phone

> using a program known as Cellebrite, which extracts data from phones and other electronic devices. Although the Cellebrite forensic examination revealed several naked photographs of KMS, it did not contain any of the Instagram communications between KMS and Barton because Instagram was a third-party platform that could not be accessed using Cellebrite.

*State v. Barton*, No. 56761-0-II, slip op. at 2 (Wash. Ct. App. June 23, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2056761-0-II%20Unpublished%20Opinion.pdf,

*review denied*, 2 Wn.3d 1011 (2024). The extraction produced photos of other young people but did not produce images of Barton.

Deputy Eastham attempted an extraction of Barton's phone, but without Barton's passcode, the extraction failed. A search warrant was issued and sent to Instagram some time before trial seeking access to the accounts belonging to KMS and Barton, but at the time of trial, the results were still outstanding.

The police ordered drug testing of hair follicle and urine on samples from KMS and the results were positive for marijuana and negative for amphetamines. The specimens were collected on September 15, 2021, soon after KMS's report to law enforcement. For the first time in this PRP, Barton has filed a copy of KMS's test results from BioMed Testing Services and an unsworn letter signed by BioMed's records custodian. The results show that KMS's hair follicle test was also negative for phencyclidine, cocaine, and opiates. Her urine test was negative for cocaine, morphine/hydrocodone, phencyclidine, MDMA/ecstasy, 6-acetylmorphine, and oxycodone/oxymorphone. The report shows that the hair follicle test was performed on a one-and-a-half inch hair sample that according to the records custodian, would show controlled substances used for approximately the 90 days preceding the sample date.

### III. CHARGES AND DISCOVERY

In mid-September 2021, the State charged Barton with three counts: second degree rape of a child, first degree incest, and delivery of narcotics (methamphetamine) to a minor. Barton retained counsel and in October, the State produced KMS's drug test results and the Cellebrite extraction report prepared by Deputy Eastham.

According to new evidence filed with Barton's PRP, Deputy Eastham was placed on unpaid administrative leave in October 2021 due to a misconduct investigation. The investigation concerned allegations that Deputy Eastham conducted an illegal search by falsely claiming he found methamphetamine in plain view during a protective sweep. The investigation also concerned Deputy Eastham's alleged pattern of mishandling, losing, or failing to return controlled substances used as K-9 officer training aids. The investigation revealed surveillance video allegedly showing that Deputy Eastham entered a locked police office after hours and used a flashlight to examine Drug Task Force files, though he was not a member of the task force.

The State did not produce information related to the misconduct investigation but according to trial counsel, the State produced other impeachment evidence against Deputy Eastham. Specifically, the State produced a disciplinary letter signed by the Pacific County Sheriff and Deputy Eastham that summarized several instances of dishonesty. For example, Deputy Eastham allegedly lied to another officer about a controlled buy, giving specific amounts and details although the buy never actually took place.

Immediately before trial, the State filed an amended information against Barton adding two additional counts of second degree rape of a child but dropping the incest and methamphetamine delivery charges. When trial began, Barton faced three counts of child rape for distinct occurrences over the summer of 2021.

IV. JURY TRIAL

A.    Opening Statements

The State's opening statement summarized KMS's anticipated testimony that Barton provided her with methamphetamine, alcohol, and marijuana over the summer when she was 13,

in the context of a sexual relationship. As we stated in our opinion resolving Barton's direct appeal, during opening

> [t]he prosecutor told the jury that KMS's testimony alone was sufficient to convict Barton and that no corroboration of KMS's testimony was required in order to find Barton guilty. The prosecutor also commented that because of issues with the investigation in this case, the State might not be able to provide corroboration for all of the testimony regarding what [CS] found on KMS's cell phone.

*Barton*, No. 56761-0-II, slip op. at 3. Finally, the State emphasized that the case was likely to come down to whether the jury believed KMS's testimony.

Barton, on the other hand, argued that KMS's allegations were not credible and criticized the police investigation. Barton argued that although the police seized his phone, "[n]o one bothered to look" at its contents to preserve the alleged Instagram messages. 1 VRP at 182. Barton's attorney went on to argue, "My client's phone was just taken. It was never forensically examined." *Id.* As we stated in our opinion resolving Barton's direct appeal:

> Barton also emphasized other deficiencies in the investigation. For instance, Barton asserted that there was no evidence KMS had undergone a sexual assault examination, that the investigating officers never sought any DNA evidence, that the investigators did not examine the places where KMS alleged the sexual activity occurred, and that the police never attempted to examine KMS's or Barton's cell phone records to determine whether they could provide any corroborating evidence regarding where the assaults were alleged to have occurred.

*Barton*, No. 56761-0-II, slip op. at 4.

B.      CrR 8.3(b) Motion to Dismiss

After the jury was released on the first day of trial, the prosecutor met with KMS, and KMS helped the prosecutor obtain a copy of the Instagram messages. Barton then moved to dismiss the case under CrR 8.3(b) due to governmental misconduct, namely withholding evidence that was on

KMS's phone and in the State's control. Again, as we explained in our opinion on Barton's direct appeal:

> The court concluded that this was an instance of discovery mismanagement that amounted to governmental misconduct because there was no reason the State could not have located these messages earlier. The court also concluded that the disclosure of the new evidence after opening statements had been made could be prejudicial because the focus of Barton's opening statement was the lack of corroborating evidence in the case.

*Barton*, No. 56761-0-II, slip op. at 5. The trial court viewed the State's failure to produce the messages as a "discovery violation" but concluded that dismissal was not warranted. 1 VRP at 209. Instead, the court excluded the documentary evidence of the messages but allowed witnesses to testify about their contents.

C.      Trial Testimony

        1.      Evidence regarding drug use and sexual contact between KMS and Barton

KMS testified that inappropriate behavior began shortly after she arrived to stay with Barton when he told her she was "an attractive little girl" and "a cute little thing," and stated that he had to avert his eyes when she bent over. 1 VRP at 236. KMS explained that Barton began a sexual relationship with her in early July and that as the summer progressed, she began to feel romantically attached to Barton and believed they were "in love." 1 VRP at 265. She described plans to run away together with Barton after she turned 18, when Barton would be 60, including that Barton promised to "help [her] become a stripper." 1 VRP at 268. She also testified that she used 1860 as the passcode on her secret cell phone, signifying "when we could actually be together." *Id.*

KMS also described the details of the sexual contact that occurred in tandem with daily use of alcohol, marijuana, and methamphetamine. She also believed she was given "some kind of sex

drug" in addition to the methamphetamine because she "thought about sex 24/7" during the time she stayed with Barton. 1 VRP at 257. KMS was familiar with marijuana before visiting Barton and testified that she brought marijuana to the property that summer. However, KMS had never used methamphetamine before that summer.

Although KMS did not have prior experience with methamphetamine, she explained in detail how sexual contact occurred for the first time after she consumed a "cloudy white crystal" with Barton in early July 2021. 1 VRP at 225. She explained that the substance made her "horny" and that after using it, she "wanted to have sex." 1 VRP at 257. She also said it made her feel "[n]umb, happy, awake, [and] energized." 1 VRP at 226. It also made her feel "loose and free" and more willing to engage in risky behavior. 1 VRP at 234. She explained in the following exchange that she relied on Barton's word that the substance was methamphetamine:

> Q.  Okay. You also mentioned methamphetamine. How did you know that it was methamphetamine?
> A.  It was, like, a cloudy white crystal and I've seen pictures . . . of that from education from school and stuff.
> Q.  Okay. How did you know that what Mr. Barton was giving you was methamphetamine?
> A.  He told me.

1 VRP at 225. KMS testified that Barton crushed the methamphetamine and helped KMS to consume it by running a tube down a line of the substance as she sniffed. KMS then testified about the events leading up to their first sexual contact:

> So, after we had smoked [marijuana], he told me that he needed to go get something from the trailer down the hill and that I should go with him. So, I said okay, I would follow him to the trailer. And I had walked in first, and when I had walked in he grabbed my hand and made me turn around, and then I kissed him and we started making out.
>  . . . .

> Next, he had grabbed my hand and told me that we should go down to the swimming hole. So, we had walked over to the swimming hole. Got down to where the water was, grabbed me, started kissing me, dragged me down onto the ground. We were still kissing. I got on top of him, and then he had turned me over, pulled my pants and my underwear down, and started oral sex on me.

1 VRP at 235-37. KMS explained that then she "gave him oral sex" for the first time, causing her to throw up. 1 VRP at 239.

KMS testified that a couple of days later, Barton penetrated her with his penis for the first time after giving her marijuana, alcohol, and methamphetamine. KMS explained that this time, Barton was driving her to the store when he asked her to let him know when she "wanted to do something special with him." 1 VRP at 245. KMS responded that she was "'down to do stuff whenever,'" including "'now'" and Barton pulled over. 1 VRP at 246. She went on to testify as follows:

> Then we start kissing. We start [indiscernible] our pants. He tells me to get in the back of the car, so I go in the back. He hops in the back. And then we start kissing again. I am on top of him now, and we have -- my pants are almost off now, and then he tells me to [indiscernible] on top of his face, so I pull my pants down and get on top of his face.
> . . . .
> And then that goes on for probably 10 minutes, 15, and then he tells me to get off, and I get off. And then he tells me to get around, so I turned around and I went lower, and then he sticks his penis inside of me. And I said -- actually, I [indiscernible] a little bit, and then he told me that he had [indiscernible] access to [indiscernible] and then we did that for probably 20 minutes, and then we heard -- he thought he heard someone coming down the road, so he put his pants up, got back to the front of the car. I got dressed, because I was naked [indiscernible] and stuff, and I got to the front of the car and we left.

1 VRP at 247-48.

KMS testified that for the rest of the summer, Barton penetrated her orally or vaginally "every day." 1 VRP at 252. She described intercourse with Barton as a "teaching experience" and testified that he told her she was "special," "different," and "more mature than [her] age." 1 VRP

11

at 240-41. KMS went on to describe in detail that in mid-July, she was penetrated with a vibrator that she described as "a little over half a foot" long. 1 VRP at 276. She recalled the incident because it was the first time she "squirted" a liquid and explained, "It surprised Ron a lot that I was able to do that, and . . . from that point on, he had been trying to get me to squirt again." 1 VRP at 262-63.

To counter KMS's allegations, Barton presented the testimony of his wife, Sandie, and mother, Judy, who denied suspecting an inappropriate relationship between Barton and KMS. They also testified they did not suspect KMS or Barton was using methamphetamine that summer. Judy was familiar with methamphetamine's effects from observing another one of her sons who was a long-term methamphetamine user. Judy described his behavior as "jumpy," "[t]alking a mile a minute," and that he "couldn't sit still." 2 VRP at 565. When asked if she saw similar behavior in KMS, she replied, "God, no." 2 VRP at 566. Judy also denied seeing similar behavior in Barton, but the State later elicited the following testimony:

Q. You know [Barton] to also have used methamphetamine; don't you?
A. I can't say for sure. I have a guess.
Q. Okay. And, I'm sorry you lost your one son to drugs.
A. He knows how I feel about it.
Q. "He" as in Ron[ald Barton]; correct?
A. Yes.
Q. And that's based on what you already had to deal with, with your one son?
A. Yes.

2 VRP at 568.

The State attacked both Sandie's and Judy's credibility including their motivations for protecting Barton. The State also presented conflicting testimony from Brittany, who testified that Sandie had told her she believed Barton and KMS were having a sexual relationship.

> 2.      Evidence regarding drug testing

The parties did not present expert testimony or documentary evidence of KMS's hair follicle test, but during Barton's initial cross-examination, Deputy Acdal testified that the police performed a hair follicle test that returned a positive result for marijuana and a negative result for methamphetamine. Barton's attorney did not immediately question Deputy Acdal regarding the date or time period that the test result covered.

On redirect examination, the State asked Deputy Acdal when KMS's hair sample was taken and then asked, "How long does methamphetamine stay inside one's system that they'd be able to find it in a hair follicle?" 1 VRP at 385. Deputy Acdal responded, "I'm not sure. No more than a few days, is what I'm told." *Id.* The State then asked, "And that's your understanding, so it makes sense that the hair follicle sample didn't come back with methamphetamine in it?" and Deputy Acdal responded, "Yeah." *Id.* Barton's attorney did not object or recross-examine Deputy Acdal regarding these answers and testimony soon ended for the day.

The next day, Barton recalled Deputy Acdal and confronted him with the document containing the test results. Barton's attorney elicited the following testimony:

> Q.    Okay. And you testified yesterday regarding the results of that test. And what were the results of that test?
> A.    So, the only thing that came back positive in her test was marijuana.
> Q.    All right. So, negative for methamphetamines?
> A.    Correct.
> Q.    Okay. And I believe [the prosecutor] asked you yesterday . . . how long, based on your training and experience -- if you know, and if you don't, that's okay -- how long amphetamines might show up in someone's hair follicles.
> A.    I can't testify on exactly how long that is . . . but . . . I do know that in urine sample, methamphetamines are only in the sample for a few days.
> Q.    Okay. But the hair follicles, theoretically, could be longer?
> A.    Yes.
> Q.    Okay. And what was the date on this test?

A.    These were done on September 15[th], 2021.
Q.    And so, that would have been four days after you were first made aware of [KMS's] allegations?
A.    Yes.

1 VRP at 400-01. After that exchange, defense counsel did not ask further questions and the State did not cross-examine Deputy Acdal regarding the hair test. Neither party attempted to lay a foundation or sought to admit the document into evidence.

3.    Evidence regarding the messages and photos seen on KMS's cell phone

KMS testified that she used a secret phone to keep in touch with Barton after she left Pacific County in August because she missed him. She described sending naked photos to Barton, messaging, and talking with Barton about "plans to run away" together when KMS turned 18. 1 VRP at 266. KMS also explained that Barton sent her Instagram messages such as, "'Can't wait to see you again to finish what we started'" and "'Can we get naked?'" 1 VRP at 272.

CS and Deputy Acdal both explained to the jury that they had seen inappropriate Instagram messages on KMS's phone before it was seized as evidence. CS explained that she recognized the Instagram profile as Barton from prior Instagram communications with him. CS saw "messages along the lines of: I miss you, baby; I love you, baby; I don't regret anything over this Summer; only five years and we can be together." 1 VRP at 478. Deputy Acdal refreshed his recollection with his contemporaneous probable cause statement and told the jury he wrote quotations from the messages in the statement verbatim. Deputy Acdal then explained, consistently with the facts above:

> There was a message saying, "Hey, baby." There was another message of [KMS] asking Mr. Barton what butt plunge was. There were also messages between -- there were messages of [KMS] stating that she didn't regret it, and then Mr. Barton saying, "I don't regret anything either."

14

1 VRP at 349. Deputy Acdal's statement was not offered into evidence, but he explained that he also saw more messages from Barton, including "'lovely pictures,' 'you are beautiful,' and Mr. Barton was also asking [KMS] when she was 18." 1 VRP at 350.

During KMS's testimony, the State offered three self-taken naked photos of KMS that she sent to Barton. CS and Deputy Acdal recognized these photos from KMS's phone and Deputy Eastham recognized them from the Cellebrite report. KMS explained that although CS had seen the photos on her phone, it would not have been apparent that she sent the photos to Barton because she had deleted them from the Instagram conversation:

> Q: Okay. And she saw that those [naked photos] had been sent to Ronald Barton?
> A: She did not see that they were sent to -- because I had deleted those photos when I sent them to him, but she had seen the photos.
> Q: And you told [CS] that you sent them --
> A: Yes.
> Q: -- to Mr. Barton?
> A: Yes.
> Q: But [CS] didn't see that they had been sent to Mr. Barton?
> A: No.

1 VRP at 279. In contrast, CS testified that she saw "probably 60 nude photos sent between them." 1 VRP at 478. When cross-examined, CS acknowledged that she caught KMS sending nude photos to a prior boyfriend before KMS stayed with Barton. Deputy Eastham testified that the Cellebrite report contained photos of other teens found on KMS's phone.

4.      Evidence regarding the investigation of Barton's cell phone

Deputy Acdal testified about the limitations of his attempts to recover documentation of the Instagram messages, including that he was unable to access Barton's phone without Barton's passcode. The State elicited the following testimony:

A.      Mr. Barton's phone was seized, as well, at the time that he was arrested.

Q.    Okay. And were you able to get into Mr. Barton's phone?
A.    No. So, the warrant that was issued for [KMS]'s phone, Mr. Barton's phone was also lumped in that search warrant; but, unfortunately, due to the Cellebrite program, unless you have their PIN number you can't do an extraction. So, we had [KMS]'s PIN number that she provided, I believe. We were never able to get a PIN number for Mr. Barton and we have not yet done an extraction due to that.
. . . .
Q.    Well, I just want to make sure it's clear to the jury, because it's hard for me to follow. A Cellebrite extraction was attempted, but without the PIN number it couldn't succeed?
A.    (No audible response.)

1 VRP at 353-54. Barton did not object to the State's questions and later asked Deputy Acdal whether he was "able to search [Barton's] phone" to verify his control of the Instagram account, and Deputy Acdal replied, "I wasn't able to get into it." 1 VRP at 376-77. Barton also cross-examined Deputy Acdal as follows:

Q.    You had difficulty opening the cell phone device that you took from my client when he was arrested.
. . . .
A.    Yes.
Q.    . . . But there are GrayKey devices that are maintained by law enforcement across the state that have the ability to open those devices in most cases; correct?
A.    Yes.
Q.    But that was not done with Mr. Barton's phone?
A.    So, it was attempted, but I was informed that the GrayKey program is not compatible with the software of Mr. Barton's phone, as well.

1 VRP at 378-79.

When Barton cross-examined Deputy Eastham about the extraction, he elicited testimony that Deputy Eastham's involvement was "limited to the forensic evaluation" of KMS's phone. 1 VRP at 411. Barton did not confront Deputy Eastham with the instances of dishonesty and disciplinary letter that the State provided to Barton prior to trial.

16

D.    Closing Arguments

The jury instructions did not include any reference to whether the State needed to present corroborating testimony for KMS's allegations. Instead, the jury instructions explained that the jurors were the sole judges of witness credibility.

Both parties, in closing arguments, tied KMS's methamphetamine-related allegations to their theories of the case. The State asked the jury to return a guilty verdict based on KMS's testimony that Barton coerced her into a sexual relationship by giving her methamphetamine and other substances. The State argued:

> A 13-year-old girl took the stand. She was groomed by her grandfather with methamphetamine, through alcohol, with marijuana, with intention. He started off talking to her about all of his sexual exploits, inappropriate behavior. She felt special. She became very fond of him. She was under the influence, most of the time.

2 VRP at 656. The State then asked rhetorically, "What 13-year-old would know how to describe methamphetamine as such?" 2 VRP at 659. The State went on to argue that KMS had "[n]o motive to lie," and that the case against Barton "boils down to credibility. Credibility of if you believe a 13-year-old girl." 2 VRP at 661-62.

Barton argued that KMS's allegations were not credible because the hair follicle test, "the only forensic evidence that we have in this case," contradicted KMS's testimony of daily methamphetamine use. 2 VRP at 676. Barton also relied on Judy's and Sandie's statements that they saw no signs of intoxication. Both parties presented competing credibility arguments as to Judy and Sandie, including their loyalty to Barton and their likely motivation to protect him.

Both parties also argued about how much weight to give testimony about the inappropriate Instagram messages allegedly sent between KMS and Barton. As we recited in our opinion on Barton's direct appeal, the State

> described the messages between Barton and KMS. The prosecutor acknowledged that although the Cellebrite process did not extract any information about these messages from KMS's phone, KMS, [CS], and Acdal all had testified about the content of the messages. The prosecutor acknowledged various deficits regarding the investigation in this case but argued that these deficits did not mean that KMS was not sexually assaulted by Barton.

*Barton*, No. 56761-0-II, slip op. at 6-7. The State also argued that KMS had no motivation to fabricate the messages because at the time the abuse came to light, KMS was trying to hide the abuse because "she didn't want [it] to end." 2 VRP at 658.

Barton, on the other hand, criticized the investigation and argued that the State failed to prove that Barton sent KMS any messages. He argued, "If there were messages between [KMS]'s phone and [Barton]'s phone, one of the easiest ways to determine whether or not those communications actually occurred would be to look at my client's phone." 2 VRP at 682. He acknowledged that law enforcement attempted to unlock his phone but argued that police should have consulted other agencies to unlock it and, that doing so, "could have allowed not only law enforcement, but Defense, and you, the jury, to see what was or was not on my client's phone." 2 VRP at 683. Barton went on to argue that the messages were "taken out of context" and review of the actual messages would have shown some innocent explanation for the exchange. 2 VRP at 681.

Finally, Barton asserted that the State had not met its burden because KMS's testimony was insufficient to support a conviction, telling the jury:

> [Y]ou cannot fill the holes in the State's case, the voids in this criminal investigation, by simply focusing on the emotional testimony of a 13-year-old girl. There has to be more. Before the State, the Government, brings somebody up on

charges of raping a child, they need to complete their investigation. They need to be sure. They need to be thorough. They need to leave no stone unturned, because it is not an allegation to be made lightly. Even if you find my client not guilty, will his life ever be the same?

2 VRP at 686. Barton then repeated the sentiment, arguing, "It has to take more than this, ladies and gentlemen. It's essential." *Id.* This argument drew no objection from the State.

E.      Verdict and Sentencing

The jury found Barton guilty of all three counts of second degree rape of a child. The State does not dispute that without a prior hearing regarding the necessity of restraints, Barton was restrained at his sentencing hearing with handcuffs, leg-irons, and a belly chain. Barton received a high standard range sentence of 194 months to lifetime confinement followed by lifetime community custody.

V. BARTON'S CHALLENGES TO HIS CONVICTION

Barton appealed his conviction based on the State's late production of the Instagram messages and raised additional arguments in his statement of additional grounds (SAG) regarding the hair follicle test, Deputy Eastham's alleged misconduct, constitutional deprivations, and ineffective appellate counsel.

While his direct appeal was pending, Barton filed this timely collateral attack, raising the following arguments: that the State failed to conduct a full investigation before charging him; that the erroneous probable cause determination and pretrial detention were based on hearsay evidence;

that the State failed to produce exculpatory evidence; and that various constitutional rights were violated, including that Washington's Rape Shield Statute is unconstitutional.[1]

We affirmed Barton's conviction in an unpublished opinion filed June 2023 and did not consider the arguments raised in Barton's SAG, because the issues raised relied on evidence outside of the record on appeal. Barton unsuccessfully petitioned for review and we issued our mandate disposing of Barton's direct appeal on January 12, 2024. Ord. Den. Rev., *State v. Barton*, No. 102176-3, at 2 (Wash. Jan. 3, 2024).

Barton was appointed PRP counsel and filed his supplemental petition on January 16, 2024, before the expiration of the one-year time bar. Ord. Appointing Couns., *In re Pers. Restraint of Barton*, No. 58245-7-II, at 1-2 (July 10, 2023). In his supplemental petition filed by counsel, Barton argues that he is unlawfully restrained because (1) he received ineffective assistance of his trial court counsel, (2) he received ineffective assistance of his appellate counsel, (3) the State withheld impeachment evidence, (4) Washington's Rape Shield Statute is unconstitutional, and (5) he was restrained at his sentencing hearing without an individualized inquiry.

With his supplemental brief, Barton filed new evidence to support his arguments, including KMS's drug testing results and an unsworn letter from the records custodian of the testing company stating that the hair follicle test would have covered approximately 90 days before the test, which would have encompassed the entire time KMS was living with Barton.

---

[1] Barton's amended initiation petition, filed a few days after his first petition, raised no new arguments and was filed before the one year deadline for collateral attack. Thus, though he did not request a formal amendment, we may consider his amended petition. RAP 16.8(e); *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 327, 394 P.3d 367 (2017).

Barton also filed a declaration from his PRP counsel declaring that after a public disclosure request, she received an investigation report and termination memorandum regarding Deputy Eastham's alleged workplace misconduct. The documents themselves were also submitted, showing that Deputy Eastham was on unpaid administrative leave at the time he testified, after allegedly lying and engaging in misconduct to further a prosecution. Barton also submitted a declaration from his trial attorney explaining that he received the disciplinary letter but no other impeachment evidence regarding Deputy Eastham. Finally, Barton and his trial counsel both declared that Barton was physically restrained at sentencing.

ANALYSIS

I. PRP PRINCIPLES

A PRP is an extraordinary remedy in that the petitioner seeks to disturb a final judgment. *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 12, 513 P.3d 769 (2022). A PRP must be filed within one year of the date the petitioner's judgment and sentence became final. RCW 10.73.090(1). Where the judgment was affirmed on direct appeal, a petitioner's judgment becomes final on the day the appellate court issues its mandate disposing of the appeal. RCW 10.73.090(3)(b).

Here, Barton filed his initial petition in May 2023, before his judgment became final in January 2024. His appointed PRP counsel filed his supplemental brief raising new arguments on January 16, 2024, also less than a year after his direct appeal became final. Thus, Barton's petition and new arguments made in his supplemental brief were timely under RCW 10.73.090(1).

A PRP petitioner bears the burden of showing unlawful restraint by a preponderance of the evidence. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004). They must

show either a constitutional error that caused actual and substantial prejudice or a nonconstitutional, fundamental defect that inherently resulted in a complete miscarriage of justice. *Id.* To meet this burden, the petitioner must identify the "facts upon which the claim of unlawful restraint . . . is based and the evidence available to support the factual allegations." RAP 16.7(a)(2).

Where the petition rests on facts outside the existing record, the petitioner must identify evidence supporting their allegations and may not rest on "mere speculation or conjecture." *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013). If their argument rests on the knowledge of others, the petitioner must provide their affidavits or other "evidence to corroborate what the petitioner believes they will reveal if subpoenaed." *Id.* However, we must be careful to note that "the purpose of a reference hearing is to resolve genuine factual disputes, not to determine whether the petitioner actually has evidence to support [their] allegations." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

## II. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Barton argues that he was denied effective assistance at trial because his attorney failed to introduce evidence that would have proved that KMS did not consume methamphetamine during the entire summer she stayed with Barton. Although we agree that trial counsel was deficient in this regard, Barton cannot show a reasonable probability that the outcome of the trial would have been different if the jury heard that KMS, a child, did not consume methamphetamine despite her testimony to the contrary. Thus, Barton was not prejudiced and is not entitled to relief.

A.     Right to Counsel

Accused persons are constitutionally entitled to effective counsel at trial. U.S. CONST. amend. VI and XIV; WASH. CONST. art. I, § 22; *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d

1020 (2024). We apply a two-pronged test to claims of ineffective assistance of counsel: the defendant must show that (1) counsel performed deficiently and (2) counsel's deficiency prejudiced the defendant. *Id.* An ineffective assistance claim raised in a PRP is subject to the same standard applied on direct appeal. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017).

Deficient performance is performance that falls below an objective standard of reasonableness considering all the circumstances. *Bertrand*, 3 Wn.3d at 128. To avoid the biases of hindsight, we strongly presume that counsel performed reasonably. *Id.* at 130. The presumption of reasonableness can be overcome by showing "an absence of any legitimate trial tactic" explaining counsel's performance. *Lui*, 188 Wn.2d at 539.

A criminal defense attorney must investigate "all reasonable lines of defense" and failure to perform a reasonable investigation can constitute deficient performance. *Davis*, 152 Wn.2d at 721. A reasonable investigation is one that enables counsel to make informed decisions about how to best represent the client. *Id.* The investigation must allow counsel to determine "'what sort of experts to consult.'" *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 881, 16 P.3d 601 (2001) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). If counsel fails to conduct a complete investigation, subsequent decisions "are reasonable only if the decision to limit the investigation was itself a product of reasonable professional judgment." *State v. K.A.B.*, 14 Wn. App. 2d 677, 713, 475 P.3d 216 (2020).

Deficient performance causes prejudice when it is reasonably probable that absent counsel's errors, "'the factfinder would have had a reasonable doubt respecting guilt.'" *Bertrand*, 3 Wn.3d at 129 (quoting *Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed.

2d 674 (1984)). This standard is lower than a preponderance of the evidence, but requires more than "a 'conceivable effect on the outcome.'" *Id.* (internal quotation marks omitted) (quoting *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017)). Rather, the probability must be "'sufficient to undermine [the court's] confidence in the outcome.'" *Id.* (alteration in original) (quoting *Strickland*, 466 U.S. at 694). A PRP petitioner who makes such a showing has necessarily satisfied the actual and substantial prejudice standard for collateral relief. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

B.     Deficient Performance

Barton argues that his attorney deficiently failed to obtain and present evidence that would have conclusively proved KMS did not consume methamphetamine during the summer of 2021 when she was staying with Barton. We agree with Barton that his trial attorney performed deficiently in this regard.

The hair follicle test was an important line of defense in this case because it showed that KMS had not consumed methamphetamine during the time period the test covered. Barton's attorney should have performed a reasonable investigation as to what time period the test results covered, after he received them in October 2021.

Barton attached to his supplemental petition a two-page report from BioMed Testing Services indicating that it conducted drug testing on KMS's hair and urine samples collected on September 15, 2021. Barton also attached a letter from BioMed's records custodian, listing her credentials and stating that the hair follicle test would have detected controlled substances that KMS consumed within 90 days prior to the sample date. Had counsel investigated pretrial, he would have obtained this evidence from BioMed Testing Services.

KMS alleged Barton was giving her methamphetamine to use during a discrete period during the summer of 2021 that corresponded very closely with the 90 days before her hair sample was taken. Counsel did not present expert or documentary evidence of the results or their duration, but instead relied on the State's witness to testify about the test results. Counsel then failed to object to Deputy Acdal's misleading testimony about the time period covered by the test—Acdal suggested that it was "[n]o more than a few days" based on what he had been told by an unidentified person. 1 VRP at 385. Deputy Acdal then agreed with the prosecutor that "it makes sense that the hair follicle sample didn't come back with methamphetamine in it." *Id.* Counsel attempted to develop the issue further the next day, but still did not present definitive evidence of the test result or the much longer time period it covered. This performance left the jury with misleading testimony as to the test's duration.

Moreover, there was no strategic reason not to pursue more definitive evidence, such as the report from BioMed with an expert's explanation to correct Deputy Acdal's testimony about the duration of the hair follicle test. At the very least, counsel could have objected to Deputy Acdal's testimony and sought a short recess. Although counsel attempted to correct Deputy Acdal's testimony, counsel never presented conclusive evidence of the test's duration that would have more strongly refuted Deputy Acdal's testimony and ultimately undermined KMS's testimony that she consumed methamphetamine with Barton all summer.

Therefore, we conclude that a reasonable investigation would have included obtaining admissible evidence of the actual duration of the test result, and the failure to present this evidence was not due to a reasonable strategic choice by trial counsel. Given all the circumstances, we hold

Barton's counsel performed deficiently by failing to obtain easily obtainable evidence about the test's duration.

C.     Prejudice

Although counsel performed deficiently, we conclude that Barton cannot show prejudice in light of the State's other evidence against him.

We acknowledge that had Barton presented evidence showing that KMS did not consume methamphetamine that summer, that evidence could have damaged KMS's credibility to some degree. As the complaining victim, KMS's credibility was "particularly relevant" because she was "central to the prosecution's case." *State v. Lee*, 188 Wn.2d 473, 488, 396 P.3d 316 (2017). We also acknowledge that methamphetamine use was tied to KMS's rape allegations because KMS testified that Barton made his first sexual advance shortly after providing her with methamphetamine for the first time. KMS explained that Barton gave her methamphetamine daily throughout the summer as a precursor to sexual contact and that methamphetamine increased her libido. Proof that she did not actually consume methamphetamine in the weeks she stayed with Barton could have undermined the strength of KMS's testimony.

However, KMS's rape allegations were highly specific, especially given that she was 13, made without a clear motive to lie, and corroborated by the Instagram messages as described by KMS and two other witnesses. It is compelling that the jury heard KMS's extremely detailed descriptions of the three charged incidents. KMS's testimony was specific, including the exact location and details about conversations and actions before, during, and after each of the charged rapes. This high level of specificity, as well as the matter-of-fact but graphic nature of this testimony, enhanced KMS's credibility.

Additionally, KMS testified that she was in love with Barton and wanted to keep the instances of intercourse a secret, going so far as to explain that she set the passcode on the phone to reflect their ages when they could be together, 18 and 60. When CS first confronted KMS, KMS wanted to protect Barton so she could continue to see him, not accuse him. The jury saw no evidence of a plausible motive for KMS to falsely accuse Barton. It is unlikely that absent such a motive, the jury would have believed KMS fabricated such elaborate testimony.

The Instagram messages between Barton and KMS also corroborated KMS's rape allegations. The messages were extremely damaging to Barton's defense, as they included a term of endearment typically used between romantic partners, explicit sexual references, and a reference to when KMS would turn 18. The message, "'I don't regret anything either'" strongly suggested an unlawful relationship and references to photos corroborated KMS's testimony that they were exchanging nude photographs. 1 VRP at 349.

Although Barton argued that he never sent the messages to KMS, the jury had little reason to doubt that the messages actually existed and were sent between KMS and Barton. CS explained that she recognized Barton's Instagram profile from her own previous communications with him on Instagram. It is immaterial that the messages were not presented as documentary evidence because they were thoroughly described by KMS, as well as CS and Deputy Acdal, who saw the messages. CS described seeing "probably 60 nude photos" sent between KMS and Barton, and both CS and Deputy Acdal recognized the nude photos that were offered into evidence. 2 VRP at 478. Therefore, regardless of how strongly Barton attacked KMS's credibility, Barton could not overcome the highly incriminating Instagram messages.

Additionally, although Barton attempted to argue that the messages were simply lacking "context"; the messages were so clearly sexually suggestive, that they could not possibly have been explained away as innocent comments between relatives. 2 VRP at 658. There is simply no "context" in which the jury could have viewed the messages as anything other than a discussion about an ongoing sexual relationship with a 13-year-old girl. *Id.*

Finally, as the State points out, a negative methamphetamine result does not mean KMS did not consume *some* unknown controlled substance. KMS testified that Barton told her the substance was methamphetamine and the jury could have concluded that Barton was lying. KMS, a child, had never used methamphetamine before the summer Barton allegedly gave it to her, though she had seen photos of it. And KMS's hair follicle test did not cover *each and every* other controlled substance that Barton could have used to make KMS more amenable to intercourse with him.[2] The State's grooming argument would have been equally strong if the jury believed KMS consumed some other drug, or even a placebo.[3] We also note that unlike this court, the jury had the opportunity to observe KMS's testimony, as well as testimony from the defense witnesses and to weigh their credibility in light of their motivations, including Judy's motivation (as his mother) to protect Barton.

---

[2] KMS's hair follicle test was also negative for phencyclidine, cocaine, and opiates, and the urine test was negative for cocaine, morphine/hydrocodone, phencyclidine, MDMA/ecstasy, 6-acetylmorphine, and oxycodone/oxymorphone.

[3] The jury could have concluded that even if the substance in question was not a controlled substance at all, Barton's point in giving it to KMS was to adultify the interaction between her and Barton and enable KMS to feel like a grown-up. This would have been consistent with KMS's hyper-focus on turning 18 so she could be with Barton.

Therefore, we conclude that the State's evidence strongly supported KMS's account of Barton's behavior, regardless of whether KMS ever actually ingested methamphetamine that summer; either because the jury could infer Barton gave KMS another unknown substance, or because other evidence strongly supported that she was raped, even if Barton did not give her methamphetamine. We conclude that the jury would have reached the same outcome even if it had heard more definitive testimony proving that KMS did not consume methamphetamine that summer. Barton therefore has not shown prejudice from his trial attorney's deficient performance.

### III. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Barton argues that in his direct appeal, his attorney performed deficiently by failing to challenge an indirect comment on his silence that Deputy Acdal made when he explained that officers "were never able to get a PIN number for Mr. Barton." 1 VRP at 353. We disagree.

PRP petitioners raising ineffective assistance of appellate counsel must show that their attorney failed to raise an issue with underlying merit and that they suffered actual prejudice from the error. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 308, 422 P.3d 458 (2018). Actual prejudice requires showing a reasonable probability that if their appellate counsel had raised the issue, the petitioner would have prevailed in their direct appeal. *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 788, 100 P.3d 279 (2004).

Because an accused person has the constitutional right to remain silent, due process prohibits the State from relying on the defendant's silence as substantive evidence of guilt. *State v. Easter*, 130 Wn.2d 228, 241, 922 P.2d 1285 (1996). However, under the open door doctrine, "a party can waive protection from a forbidden topic by broaching the subject" and thereby increasing the subject's relevance at trial. *State v. Rushworth*, 12 Wn. App. 2d 466, 473, 458 P.3d 1192

(2020); *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969). The doctrine applies to evidence that would be inadmissible "for reasons of policy or undue prejudice," but courts can decline to apply the doctrine based on other evidentiary rules. *Rushworth*, 12 Wn. App. 2d at 473; *Fite v. Mudd*, 19 Wn. App. 2d 917, 935, 498 P.3d 538 (2021).

Washington courts have held that when the accused opens the door to otherwise prohibited comments about their postarrest silence, the defendant has waived their right to have the evidence excluded on constitutional grounds. *State v. Vargas*, 25 Wn. App. 809, 812, 610 P.2d 1 (1980); *State v. Kendrick*, 47 Wn. App. 620, 630-31, 736 P.2d 1079 (1987). Whether the defendant has opened the door, in the Fifth Amendment context, depends on whether the State's subsequent testimony is relevant to rebut a false or misleading impression created by the defense's argument or evidence. *See State v. Holmes*, 122 Wn. App. 438, 444-45, 93 P.3d 212 (2004) (defendant, who elicited testimony that he cooperated with police, did not open the door to testimony that he did not act surprised when arrested because this went beyond rebutting the impression that he cooperated with police); *Vargas*, 25 Wn. App. at 812 (defendant opened door to evidence of his postarrest silence by testifying that he cooperated fully and gave a statement to police).

Here, Barton opened the door to the challenged testimony when in his opening statement, Barton argued that the police seized his cell phone but did not properly investigate it. In the context of Barton's entire argument, his comments invited the jury to infer police incompetence from the fact that the State did not present a Cellebrite examination of his phone. He commented, for instance, that although the police had his phone, "[n]o one bothered to look" for evidence that could have shown what truly happened. 1 VRP at 182. This argument, and similar ones, left the jury with the false impression that the police could have performed a Cellebrite extraction with the

information it had. Thus, the State was permitted under the open door doctrine to introduce rebutting evidence explaining that it could not perform the extraction.

Additionally, Barton failed to object to Deputy Acdal's initial testimony about why he could not obtain the contents of Barton's phone; Barton elicited similar testimony during cross-examination; and he relied on Deputy Acdal's testimony on this subject in his closing remarks. Thus, the argument underlying Barton's claim of ineffective assistance of appellate counsel would not necessarily have been reached in Barton's direct appeal because of a failure to preserve, even if it were raised and argued by competent appellate counsel. *See* RAP 2.5(a). And although we need not engage in a full RAP 2.5(a) analysis to conclude that no error occurred, Barton's strategic decisions suggest that trial counsel did not view the challenged comments as harmful to his defense, but may instead have viewed them as helpful.

Barton relies on *Hemphill v. New York*, 595 U.S. 140, 142 S. Ct. 681, 211 L. Ed. 2d 534 (2022), to assert that "a defendant cannot open the door to a constitutional violation." Reply Br. of Pet'r at 13. Although this may be one possible reading of *Hemphill*, Barton has not shown it to be the correct one. We decline the invitation to apply Barton's broad reading of *Hemphill* in this context because *Hemphill* involved a Sixth Amendment challenge to the trial court's admission of unconfronted testimonial hearsay. Whereas here, Barton's postarrest silence was protected by the Fifth and Fourteenth Amendments, and that protection is otherwise subject to waiver on fairness and policy grounds. 595 U.S. at 151-53.

As explained above, Washington precedent permits the application of our open door rule in the Fifth Amendment context. That precedent is not inconsistent with *Hemphill* because our open door rule contemplates that even after the door is opened, evidence can still be subject to

exclusion on other evidentiary grounds. *See Rushworth*, 12 Wn. App. 2d at 473; *Fite*, 19 Wn. App. 2d at 935. Moreover, federal precedent allows for waiver of the Fifth Amendment privilege in a wide variety of contexts, including analogous evidentiary contexts where, under the circumstances, "[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Brown v. United States*, 356 U.S. 148, 156, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958) (defendant waived privilege with respect to cross-examination within proper scope of his own voluntary direct testimony); *see also Kansas v. Cheever*, 571 U.S. 87, 95, 134 S. Ct. 596, 187 L. Ed. 519 (2013) (defendant waived privilege by introducing expert testimony on his mental state). We are therefore unconvinced that *Hemphill* should be read to prevent waiver of the Fifth Amendment privilege by opening the door under the facts of this case, where Barton introduced the subject to inquiry, left a misleading impression, and thereafter emphasized the challenged comments in his closing argument.[4]

In sum, Barton's appellate attorney would not have succeeded if she had argued Deputy Acdal's comment was a basis for reversal because Barton's trial counsel opened the door to the comment, failed to object or move to strike the comment, and later relied on the challenged testimony in closing. We need not address the issue of whether the comment amounted to an indirect comment on his silence because regardless of this, Barton cannot show the requisite prejudice. Therefore, his claim of ineffective assistance of appellate counsel fails.

---

[4] We recognize that *Hemphill* also discussed the Fifth Amendment with regard to exclusion of a defendant's coerced statements, but there is no argument involving coercion here. 595 U.S. at 154. We are unaware of a case that applies *Hemphill*'s reasoning to postarrest silence, a right that is unquestionably waivable.

## IV. *BRADY* VIOLATION

Barton argues that the State violated his right to due process by withholding material evidence that was favorable to his defense. He claims that the State should have produced evidence of Deputy Eastham's untrustworthiness and possible corruption. Although we are deeply troubled by the State's failure to disclose the facts Barton now identifies, we conclude that because of the limited nature of Deputy Eastham's testimony, Barton was not prejudiced and therefore is not entitled to relief on this basis.

Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), a prosecutor has the duty to discover and disclose favorable evidence that is "known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). This duty is mandatory "regardless of any failure by the police to bring favorable evidence to the prosecutor's attention." *Id.* at 420.

A defendant raising a *Brady* violation must show that the particular piece of evidence was exculpatory or impeaching, willfully or inadvertently suppressed, and material to the outcome of their case. *In re Pers. Restraint of Mulamba*, 199 Wn.2d 488, 498, 508 P.3d 645 (2022). We apply this standard whether the defendant raises their *Brady* argument in a PRP or on direct appeal. *Id.* Under the third prong, the defendant must show a reasonable probability that if the evidence had been timely disclosed to the defense, their trial would have reached a different outcome. *Id.*

In this PRP, Barton has attached evidence suggesting that Deputy Eastham lied and engaged in misconduct to further a prosecution, that he was on unpaid administrative leave at the time he testified due to an investigation, and that he had a poor reputation for truthfulness. The evidence suggests that Deputy Eastham had a pattern of, for instance, losing or otherwise

mishandling controlled substances during his time as a police officer. It also suggests that Deputy Eastham took steps to falsely imply that drugs were lawfully found in plain view during a protective sweep.

However troubling this evidence is, Barton is not entitled to relief absent a showing of prejudice or materiality. Deputy Eastham played a very minor role in the State's investigation of Barton, having contributed only by running the Cellebrite extraction on KMS's phone. Although this was a search, extracting data from a cell phone does not provide the same opportunity to manipulate the search results as Deputy Eastham allegedly did during the protective sweep described in Barton's newly provided evidence. Moreover, although the Cellebrite report was a major point of contention between the parties, that controversy involved what the Cellebrite undisputedly did *not* show (Instagram messages), rather than evidence that could have been unlawfully obtained or manufactured. And though the parties argued competing inferences from the missing Instagram messages, they did not disagree on the essential facts that the State introduced through Deputy Eastham's testimony.

Barton emphasizes that Deputy Eastham was responsible for downloading nude photos from KMS's phone, but none of the parties has ever disputed that her phone contained such photos of herself and other teenagers around her age. And Deputy Eastham did not testify that these images were sent to Barton on Instagram; instead, he testified that he could not download messages or pictures from Instagram using Cellebrite. Therefore, attacking Deputy Eastham's credibility would not have changed the jury's verdict.

Furthermore, according to Barton, the State *did* timely produce a significant amount of impeachment evidence that detailed many instances of dishonesty, including that Deputy Eastham

lied extensively to another officer about a fictitious controlled buy that never took place. Barton did not impeach Deputy Eastham with this evidence, evidently agreeing with our assessment that doing so would not aid his client's defense. Counsel may also have had a tactical reason to avoid appearing to attack law enforcement, especially where the evidence Deputy Eastham was presenting was technical and uncontroverted.

Therefore, notwithstanding the troubling police misconduct Barton has identified in this PRP, we conclude that in light of Deputy Eastham's limited involvement, Barton cannot show that the withheld evidence would have had any impact on his trial. Barton has not demonstrated that he is entitled to relief due to a *Brady* violation.

## V. RAPE SHIELD STATUTE

Barton also argues that he is unlawfully restrained under an allegedly unconstitutional provision within Washington's Rape Shield Statute. Barton claims that RCW 9A.44.020(1) violates several constitutional principles, including separation of powers; the privileges and immunities clause; the equal protection clause; and the prohibition against bills of attainder. We disagree.

The challenged statutory provision reads, "In order to convict a person of any crime defined in [chapter 9A.44 RCW, sex offenses] it shall not be necessary that the testimony of the alleged victim be corroborated." RCW 9A.44.020(1).[5] Because we presume statutes are constitutional, Barton bears the burden of proving this provision's unconstitutionality beyond a reasonable doubt. S*tate v. Farmer*, 116 Wn.2d 414, 419, 805 P.2d 200 (1991). Additionally, to obtain collateral relief

---

[5] We cite the current statute because recent amendments do not affect our analysis. *Compare* RCW 9A.44.020 *to* former RCW 9A.44.020 (2013).

Barton must state specific facts and argument to show that his restraint is unlawful. RAP 16.7(a)(2). Arguments made only in broad, general terms are insufficient to merit collateral review. *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 327-28, 394 P.3d 367 (2017).

As a threshold matter, we first note that at common law, and in Washington before 1907, a rape victim's testimony was sufficient to support a jury's guilty verdict. *State v. Fetterly*, 33 Wash. 599, 603, 74 P. 810 (1903); *State v. Roller*, 30 Wash. 692, 695, 71 P. 718 (1903). Barton is correct that Washington enacted a corroboration requirement in 1907, but the corroboration requirement was repealed in 1913. *See* LAWS OF 1907, ch. 170, § 1; LAWS OF 1913, ch. 100, § 1. *See also State v. Morden*, 87 Wash. 465, 467-69, 151 P. 832 (1915) (explaining that the 1907 statute departed from common law and applying pre-1907 case law to hold that no corroboration was required after repeal of the statute). Therefore, when viewed in its proper context the challenged provision merely codified the status quo at common law, reflected what Washington courts had already held, and articulated an expression of the central tenet that credibility determinations are for juries to decide.[6]

It is true that the noncorroboration *instruction* has been widely criticized. *See, e.g., State v. Zimmerman*, 130 Wn. App. 170, 180-83, 121 P.3d 1216 (2005) (noncorroboration instructions are problematic but are not unconstitutional comments on the evidence); *State v. Kovalenko*, 30 Wn.

---

[6] *See* Wallace D. Loh, *The Impact of Common Law and Reform Rape Statutes on Prosecution: An Empirical Study*, 55 WASH. L. REV. 543, 561 (1980) ("Washington courts, however, have not required corroborated testimony and the new statute [former RCW 9A.44.020(1) (1979)] codifies existing case law for both forcible and statutory rape."); Susan Estrich, *Rape*, 95 YALE L.J. 1087, 1137 (1986) (no corroboration requirement at common law; legislatures enacted corroboration requirements based on concerns about the difficulty of defending against a false accusation of a sexual offense and a perceived tendency for rape victims to lie); U.S. CONST. amends. X, XI, XIV; *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (Sixth Amendment guarantee of trial by jury requires a jury verdict of guilty beyond a reasonable doubt).

App. 2d 729, 745, 546 P.3d 514 (2024) (same); *State v. Rohleder*, __ Wn. App. 2d __, 550 P.3d 1042, 1045-48 (2024) (same). But those criticisms derive not from the content of the provision but from the idea that jurors could view the instruction as a comment on the evidence. And as we have discussed at length above, KMS's testimony was actually corroborated in this case. Thus, without a jury instruction, it is difficult to see how the provision could have affected the jury's assessment of the State's case against Barton.

Barton asserts broadly that he was prejudiced when the prosecutor mentioned in opening statements, without objection, that the State was not legally required to corroborate KMS's testimony to meet its evidentiary burden. But the remark itself was brief, isolated, and not repeated. Barton does not explain how the remark could possibly have impacted the jury's verdict where the State *did* present corroborating evidence for KMS's allegations.

Furthermore, even though the court did not give a noncorroboration instruction here, Barton's argument in closing is an example of why such an instruction is permissible in some cases. Barton's attorney told the jury, without objection, that it could not convict Barton "by simply focusing on the emotional testimony of a 13-year-old girl." 2 VRP at 686. This is a misstatement of the law; a jury can convict based on a victim's testimony alone if it finds that testimony credible. The State was entitled to argue that KMS's testimony, if credible, could be determinative.

We conclude that Barton's argument is insufficient to meet his burden to prove unlawful restraint on this ground because he has failed to show how the State's comment, made only in opening, made any difference in the jury's verdict.

## VI. SENTENCING

Barton argues that he was denied due process because he was denied an individualized inquiry before appearing in restraints at his sentencing hearing. Shackles and other restraints risk impairing decision-making due to implicit bias, regardless of whether the decision-maker is a judge or a jury. *State v. Luthi*, 3 Wn.3d 249, 260, 549 P.3d 712 (2024). In light of that risk, due process requires that "trial courts *must* engage in an individualized inquiry before *every* hearing to determine whether there are extraordinary circumstances justifying courtroom restraints for security reasons." *Id.* at 265.

The State concedes that Barton is entitled to resentencing because here, the court made no individualized inquiry into the need for restraint. We accept the State's concession and remand for resentencing.

## VII. ADDITIONAL ARGUMENTS

Barton's initiation petition challenges his confinement on the following grounds not addressed in his supplemental petition: the State failed to conduct a full investigation before charging him, erroneous probable cause determination and pretrial detention based on hearsay evidence, and various other constitutional grounds. To the extent that Barton's petition overlaps with his PRP counsel's supplemental briefing with regard to the constitutionality of RCW 9.94A.020(1) and ineffective assistance of counsel, those issues are addressed above. Barton's initiation petition otherwise makes arguments only in broad, general terms, referring to constitutional provisions, statutes, and rules—but he fails to alert us to how these laws were violated or facts supporting these arguments. RAP 16.7(a)(2); *Rhem*, 188 Wn.2d at 327-28.

No. 58245-7-II

Therefore, we decline to reach the arguments in Barton's initiation petition that were not briefed by counsel.

CONCLUSION

We grant the petition in part based on shackling at sentencing and remand for resentencing, but we otherwise deny the petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, J.

We concur:

CRUSER, C.J.

VELJACIC, J.